No. 147.—BUJAC & GIRARDY *v.* GEORGE WILLIAMSON.

An amended answer, particularizing the fraudulent practices and misrepresentations charged in the original answer, may be filed at any time before the cause is set down for trial.

Evidence offered by defendants to show that other parties claimed the patent rights which plaintiffs professed to own, and that suit had been instituted for an infringement of it, was excluded by the court *a qua*. Held—That the ruling was correct, for the reason that the testimony was irrelevant, and that there was no allegation in the answer warranting such proof.

Under the allegations of fraud and deception contained in the answer, the evidence of the defendant is admissible to show all the circumstances tending to establish the charges.

APPEAL from the Tenth Judicial District, parish of Caddo. *C. C. Henderson* (attorney at law), Special Judge, *vice* Levisee, J., recused. *Looney & Wells*, for plaintiffs and appellants. *Egan, Williamson & Wise* and *S. L. Taylor*, for defendant and appellee.

This case was tried by a jury in the court below, and involves only questions of fact on the merits.

TALIAFERRO, J. The plaintiffs sue on a promissory note executed in their favor by the defendant for the sum of $3800, dated March 2, 1867, due September 1, the same year, and stipulating interest at eight per cent. per annum from date, and $3 75 cost of protest. The defendant's answer avers failure of consideration for which the note was given,

Bujac & Girardy v. Williamson.

arising from fraudulent practices and misrepresentations of M. J. Bujac, one of the plaintiffs. In an amended answer the defendant sets out more specifically the acts and misrepresentations complained of. The case was put before a jury and a verdict in favor of the defendant was returned. The judgment was rendered accordingly, and the plaintiffs have appealed.

It seems that in January, 1866, a company was organized at Shreveport for the purpose of manufacturing ice. The defendant took stock to the amount of $1000, which was afterwards increased to $5000. The plaintiffs appear to have encouraged and promoted the undertaking. They furnished the machines and appliances necessary in the manufacturing of ice. They procured for the company engineers and persons skilled in the working of the machines necessary in the process of ice making, and had such repairs made as were required to be done in New Orleans. Early in March they sold a machine to the company, and in July following another. In September, 1866, the company amended their charter and increased their stock. After this the company purchased the patent for ice making in Harrison and Marion counties, Texas.

The enterprise proved to be a failure. Operations it appears were continued during the years 1866 and 1867 at intervals, under the management of the company. In 1868, during part of the year, the ice works were leased out. Subsequently, during the same year, the company was dissolved and its assets sold by the sheriff. The consideration of the note sued on was thirty-eight shares of the stock of the company.

The defendant avers that he was induced to embark in the undertaking by the representations of the plaintiff, Bujac, who spoke in terms of the highest commendation of the machines which he induced the company to purchase, by stating that they were in successful operation in Europe, where ice was made by them at a profit even when it was sold at a cent per pound. That the machines were capable, each, of producing four thousand pounds of ice per day of twenty-four hours. That the machines were new or at least had been but little used.

The defendant avers that being entirely unacquainted with the new business he was about to engage in he relied upon the statements of Bujac, in regard to the character and capacity of the machines, which were purchased upon his advice. That the plaintiffs held out to him that the large dividends to be divided by the company could be applied to the payment of the note sued upon. That the value of the stock depended upon the efficiency of the machinery.

The defendant shows that Bujac was very urgent that the company should buy the second machine and the patent right for the counties of Marion and Harrison, in Texas, representing that he could sell to other parties, and recommended that the company should purchase.

The defendant alleges that none of these representations were true. He charges that the machines were old and to a great extent worthless. That worked to their greatest capacity and by skillful men, they fell far short of making four thousand pounds of ice, each, per day. That frequent and costly repairs were necessary, and that the making of these repairs necessarily produced injurious delays in business. He states in his own testimony that as president of the company he endeavored to sell the patent right for the two counties in Texas, but failed to receive an offer, after giving publicity to the proposition by advertisement and otherwise, and after great efforts to make the sale.

We find in the record several bills of exceptions. The first is to the admission of the amended answer of the defendant on the ground,

*First*—That it came too late, being dilatory in its character.

*Second*—That it changes the issue, setting up new facts, and takes plaintiffs by surprise.

*Third*—That the allegations of the amended answer are irrelevant to the issue.

The objections were overruled by the judge *a quo* for the reason that the amended answer merely particularized the fraudulent practices and misrepresentations charged in the original answer, and that this might be done at any time before the case was set down for trial. We think, from reading the answers of the defendant, that the objections were properly overruled for the reasons stated by the judge. The second and third bills of exceptions were taken by plaintiffs to the admission of evidence on the ground of irrelevancy. We think they were properly overruled.

The fourth was taken by the defendant to the refusal of the court to admit evidence to show that other parties claimed the patent right which Bujac & Girardy professed to own, *and* that suit had been instituted for infringement of it.

This ruling we think correct, and that the plaintiffs' objections were properly sustained, for the reason that the testimony was irrelevant, and that there was no allegation in the answer that warranted such proof.

The fifth bill of exceptions was taken by the plaintiffs to the admission of the defendant's own testimony to show that, before the note sued on was executed, defendant told plaintiffs that he had already invested $5000 in stock, and did not wish to give cash for more until he could be assured of the success of the enterprise, and that if it proved a failure the defendant should not be bound for the whole, and that the note should not be negotiated. The objection was, that it was the admission of parol testimony to contradict a written obligation. We think the judge *a quo* properly overruled the objection. The defendant had charged directly fraud, misrepresentation, and general bad faith in the plaintiffs, and error on his own part. The testimony was admissible under these allegations.

This is a case presenting mainly questions of fact. The record is voluminous, embracing a great array of testimony, both written and oral, and to a considerable extent the evidence is conflicting. Two of the defendant's witnesses, Beckwith and Cooper, who were in charge of the works and ran the machines, swear that there were frequent "projections" occurring during their operations, which caused stoppages of three or four hours each. By projections they meant the heating of the ammonia too much, causing it in its fluid state to overflow and pass through other portions of the machinery.

Beckwith states that the first machine purchased by the company, designated as the "*Red*" one, broke down in the summer of 1866, when there was the greatest demand for ice, and that the company lost the whole of the remainder of that season. The second or "*Black*" machine, the same witness states, was put up in September, 1866; that he thought it an old one, and that it did not do so well as the old machine. Says the machines did not produce more than two thousand pounds of ice per day. States that Putz instructed him and other employes in the management and manufacture of ice. That the Red machine appeared to him to be good; when brought to Shreveport it had been recently painted, which gave it the appearance of being new. That for the first three or four months after it was put up it made, on an average, about three thousand pounds of ice per day; thinks the machine was run to its utmost capacity. There were no repairs during the first three or four months. Before Putz left, witness *thinks* Putz told him that he and other employes were competent to run the machine. Witness, in his own opinion, ran the machine as successfully as Putz had done.

Cooper states that the machines were old, and he thought badly corroded. He attributed the deficiency in production to that cause. Neither of them, he says, was capable of producing four thousand pounds of ice per day throughout the year. He states that the employes at the establishment were instructed by men who considered themselves first class ice makers, viz: Putz and Labarre.

This testimony of Cooper and Beckwith is corroborated by several other witnesses, as to the deficiencies of the machines, delays in operating, and other things. They are not versed in the business of ice making, and have no sufficient knowledge of the apparatus used in the process.

On the part of the plaintiffs two witnesses, Labarre and Putz, testify as to the machines and the manner of their working. These men, it appears, were sent to Shreveport by the plaintiffs, to inaugurate the business of ice making there and to superintend the establishment at the beginning, and to instruct others who were to succeed them in the management of the machines.

Labarre says: I know that the Shreveport company used Carrie's Patent Ice Machine. I worked myself and put up one of them in Shreveport, and successfully. The other machine had been put up by my foreman, Joseph Putz, which machine gave so much satisfaction that Mr. Williamson, the defendant and president of the Shreveport company, gave the most gratifying certificate of the success of the machine. The cause of the failure, or partly a failure there, was owing to the ignorance and bad administration. I know it from what I saw in Shreveport, and afterwards by what my foreman told me. In answer to an interrogatory to the witness he says : I have already answered this interrogatory by stating that the failure, or partial failure, was owing to the ignorance and bad administration of those who had charge of the machines.

Joseph Putz says: That he is well acquainted with Carrie's ice machine ; knows it to · be a success. Put up the two machines at Shreveport, one with Mr. Labarre and the other with Mr. Henry Bujac. The machines were tested and worked successfully during the time I was there. If, after I left it was a failure, or not a complete success, it was due to the incompetency and bad administration of those having charge of the machines. I was employed by the company about three months, and during that time the machines were working with satisfaction, and I left them in good running order.

Henry Bujac, another witness for plaintiffs, swears that he is thoroughly acquainted with Carrie's Patent Ice Machine, having learned the theory and practice and setting up the machine in the shop of Carrie & Co., in Paris. I have seen these machines tried and tested in Paris and in America, and they are pronounced a complete success. I accompanied and helped to put up the second Carrie's ice machine purchased by the Shreveport company, and state that it was a success by certificates to that effect being given by the president of the company. I make the statement because as long as competent workmen had charge of the machine the results were as plaintiff pronounced them to be. As soon as the workmen, furnished by plaintiff, left Shreveport the machines fell into the hands of ignorants, who worked it with so little care or attention that it produced hardly anything. The first machine, the witness states, failed through want of knowledge of those employed. The second one worked to entire satisfaction. The reason of the failure was not from any defect in the machine, "but solely on the part of the grand and utter ignorance of the workmen employed by the company." They did not want to be corrected in their faults. In fact they run the machine as if it was a steam engine. As long as such workmen as Putz was at the factory at Shreveport, the working of the machines was so satisfactory that, if my memory serves me right, on a capital of $45,000 the company declared, in the space of three months, six per cent. and five per cent. dividend.

It appears, from what we gather from the record, that the ice making business was commenced in the month of April. The plaintiffs introduce a letter of the defendant as president of the company, dated June 22, 1866, as follows:

"SHREVEPORT, June 22, 1866.

" *Gentlemen*—We have the pleasure of saying, at the request of Mr. J. Putz, that his services have been very useful. His thorough, practical knowledge of the ice machine, and his devoted sense of duty make us reluctant to part with him. He has been paid by the company in full up to the cessation of his labors on the fifteenth instant; but this discharge of our pecuniary obligation to him renders us not the less appreciative of the great advantage he has been to us in putting the machine in operation and instructing our employes.

" Very respectfully, your ob't serv't,
" GEORGE WILLIAMSON,
"President S. I. M. Co.

" To Messrs. Henslor, Labarre & Co., New Orleans."

In the margin :

"P. S.—Mr. Putz has fully complied with his promise to make the machine produce 4000 pounds per day of twenty-four hours.

" We believe, with such an industrious and systematic manager as he is, that our machine would produce this quantity daily. Yours,

" GEORGE WILLIAMSON, President S. I. M. Co."

The plaintiffs also produce the following certificate from the assistant secretary of the company :

"SHREVEPORT, October 10, 1866.

" I do hereby certify that Mr. Putz, in being relieved from his duties as superintendent of the Shreveport ice works, left the machines in perfect running order, with a capacity of making 8000 pounds in twenty-four hours. W. T. EUSTACE,
"Assistant Secretary S. I. M. Co."

The witness Beckwith, says that Putz remained at the ice works about three months and a half after the machine was in operation; that there were no repairs during the first three or four months ; that they had to stop as often as once a week to clean out and repair, and sometimes oftener.

On the part of the plaintiffs, who were interested in the success of the undertaking, they seem to have been solicitous on the subject of having competent men to manage the machines, and who possessed the scientific and practical knowledge of ice making. They wrote, under date of seventh of June, 1867, expressing surprise on hearing that Hicot, who, it seems, went with Moysette to Shreveport in the capacity of a workman, had been discharged. Moysette was a work-

man expressly engaged by the owners of the patent in December, 1866, in Paris, to superintend and manage the working of ice machines. He was employed by the Shreveport company in March, 1867, at the same wages that Hensly & Labarre were to give. They expressed apprehensions, from reports that reached them, that Moysette would also be discharged, and they say:

"We beg of you, in view of the interests of all concerned, not to let Moysette go, for he can get more out of your machines than any man around Shreveport. We fear that if Moysette should leave, you would lose the whole season."

Cutliff, a witness, states that Hicot and Moysette were employed by the company at the express recommendation of the plaintiffs.

The defendant charges that at the time of the execution of the note, the stock was actually worthless or nearly so. The note was given in March 2, 1867. He admits that in June following there had been a sale of stock in Shreveport at one twenty, and he advised plaintiffs, by letter, to hold on to their stock at one twenty-five. He says, in his own testimony, that when he wrote this letter the retort of the second machine was in New Orleans for repairs, and where he supposed it would be thoroughly repaired.

Nutt, a witness, says: "The stock of the company in March, 1867, had a speculative or prospective value, dependent upon the success of the enterprise." This witness states that the purchase of the second machine and the patent right for the two counties in Texas, did involve the company in debt and heavy expenses. That Bujac represented to witness that they could sell to other parties the patent right for manufacturing and selling ice in Marion and Harrison counties, Texas, and recommended that the Shreveport company should purchase at once.

After reviewing all the testimony adduced, and it constitutes a large mass, we find ourselves inclined to a different conclusion than that arrived at by the jury. The main question in this case is, was there a failure of consideration for the note, and was the defendant injured by deception and misrepresentation practiced upon them by the plaintiffs? We think that the testimony does not sustain this charge.

It is therefore ordered, adjudged and decreed, that the judgment of the district court be annulled, avoided and reversed. It is further ordered, that the plaintiffs recover from the defendant the sum of $3800, with interest thereon at the rate of eight per cent. per annum from the second day of March, 1867, until paid, and the further sum of $3 75 cost of protest and all costs of this suit.

Rehearing refused.