JAMES HARTNESS *v.* HARRY A. BLACK.

Special Term, April 7, 1921.

Present: WATSON, C. J., POWERS, TAYLOR, MILES, and SLACK, JJ.

Opinion filed May 3, 1921.

*Constitutional Law—Governor's Power of Approval and Disapproval of Bills Passed by Legislature—Practical Construction Resorted to Only in Case of Ambiguity—Construction of Written Instruments—Governor May Approve Bills After Adjournment of Legislature—Conduct of Public Officers Presumed to be Regular—Governor May Approve Bills Presented After Adjournment of Legislature—Bills Presented Within Three Days of Adjournment of Legislature Must Be Approved Within Five Days After Presentation.*

1.  The power of approval or disapproval by the Governor of bills passed by the General Assembly conferred by Section 11, Chapter 2, of the Constitution, is only a restraint on the supreme legislative authority vested in the General Assembly by Section 6, and its nature cannot be extended by construction, especially in view of Section 5, providing that the Legislative, Executive, and Judiciary departments shall be separate and distinct, "so that neither exercise the powers properly belonging to the others."

2. The practical construction of a provision of the Constitution by officers charged by law with duties in respect thereto can be resorted to in aid of its interpretation only in case of doubtful meaning; and, when the language is unambiguous, its meaning cannot be modified or controlled by practice, however long continued.

3. In construing a written instrument, resort is first had to the obvious meaning of the language used, and, if this is explicit and unequivocal, all inference by way of construction is excluded.

4. Under Section 11, Chapter 2, of the Constitution, the Governor is authorized to approve and sign bills in his hands for revision after the final adjournment of the Legislature, except that he is limited as to time to the period of five days (Sundays excepted) after the bill has been presented to him.

5. When the conduct of public officers is involved, all reasonable presumptions are indulged in favor of regularity.

6. Under Section 11, Chapter 2, of the Constitution, the Governor is authorized to approve and sign bills presented to him after final adjournment of the Legislature, if done within the time allowed.

7. Unless a bill presented to the Governor within three days before final adjournment of both Houses is approved by him within five days (Sundays excepted) after presentation, it does not become a law.

PETITION to the Supreme Court by James Hartness, Governor of the State, for a writ of mandamus directing Harry A. Black, as Secretary of State, to cause to be engrossed certain acts of the General Assembly of 1921, under the provisions of G. L. 370, and to cause such acts to be published in the newspapers of the State, under the provisions of G. L. 7522. Heard on the petition and answer. The opinion states the case.

*Wade Keyes, Hale K. Darling,* and *Julius A. Willcox* for the petitioner.

*George L. Hunt* and *John M. Avery* for the petitionee.

TAYLOR, J. The petitioner, as Governor of the State, brings this petition for a writ of mandamus, directing the petitionee,

as Secretary of State, to cause certain acts of the General Assembly of 1921 to be engrossed and published as required by law. Among the facts established by the petition and answer are the following: The bienniel session of the General Assembly of 1921 took final adjournment March 31, 1921. On the last three days of the session and the day following adjournment, divers bills—eighty in number—were received by the petitioner, as Governor, which were approved and signed by him after the Legislature adjourned. His attention being called to the fact that the Secretary of State was of the opinion that certain of the bills so approved and signed were not entitled to be engrossed and promulgated as public acts, Governor Hartness addressed an inquiry to the Secretary of State which elicited the following reply: "I am of the opinion that the following bills passed at the last session of the Legislature, which received your approval and were delivered to me, are not entitled to be engrossed and promulgated as public acts. The list of the bills is as follows, and I give in detail the date when received in your office and the date when approved by you, all as appears from the bills on file in my office: [Then follows a list of the bills designated by number, with the date when each was received by the Governor and when signed by him.] It thus appears that some of these bills were received in your office before March 31, the day of final adjournment, some on the day of final adjournment, and some on the day after final adjournment. All were signed after final adjournment. It is my opinion that in order to make effective acts of the General Assembly the same should have been presented to you and have received your approval before the Legislature took final adjournment and that your approval of the acts after the Legislature adjourned did not give them validity and entitle them to promulgation and engrossment as laws. I therefore respectfully decline to promulgate and publish the acts above specified and to cause such acts to be engrossed under the provisions of section 370 of the General Laws." From the list contained in the foregoing communication it appears that twenty-seven bills were presented to the Governor March 29, and signed April 1; forty-three were presented March 30, and signed April 1; five were presented March 31, of which four were signed April 1, and one April 5; four were presented April 1 (the day after adjournment), one of which was signed the

same day and the other three on April 5; and one (S-30) was presented March 30 and signed April 6.

It will be seen that there are three classes of bills presenting as many separate questions, *viz.:*  (1) Does a bill which has been presented to the Governor within three days *before* final adjournment and approved by him *after* such adjournment and within five days after presentation thereby become a law?  (2) Does a bill which has been presented to the Governor the next day *after* final adjournment and approved by him within five days thereafter thereby become a law?  (3) Does a bill which has been presented to the Governor within three days *before* final adjournment and approved by him more than five days after such presentation become a law?  The answers to these inquires depend upon the interpretation to be given to the constitutional provision relating to the approval of bills.  Chapter 2, Section 11, of the Constitution provides: "Every bill which shall have passed the Senate and House of Representatives shall, before it becomes a law, be presented to the Governor; if he approve, he shall sign it; if not he shall return it, with his objections in writing, to the House in which it originated; which shall proceed to reconsider it.  If, upon reconsideration, two-thirds of the members present of that House shall pass the bill, it shall, together with the objections, be sent to the other House, by which it shall likewise be reconsidered, and, if approved by two-thirds of the members present of that House, it shall become a law.

"But, in all such cases, the votes of both Houses shall be taken by yeas and nays, and the names of the persons voting for or against the bill shall be entered on the journal of each House respectively.  If any bill shall not be returned by the Governor, as aforesaid, within five days (Sundays excepted) after it shall have been presented to him, the same shall become a law in like manner as if he had signed it; unless the two Houses by their adjournment, within three days after the presentation of such bill shall prevent its return, in which case it shall not become a law."

The true relation of the executive department of government to matters of legislation lies at the foundation of the inquiry and can be better understood if account is taken of the successive steps by which the existing power has been reached.  The Constitution of 1777 provided: "The Commonwealth or State of Vermont, shall be governed, hereafter, by a Governor, Deputy

Governor, Council, and an Assembly of the Representatives of the Freemen of the same." It provided that the supreme legislative power should be vested in a House of Representatives, and the supreme executive power in a Governor and Council. A judiciary department was provided for by a requirement that courts of justice should be established in each county of the State. Under this general frame of government it was provided, "to the end that laws, before they are enacted, may be more maturely considered, and the inconveniency of hasty determination as much as possible prevented," that bills of a public nature should be first laid before the Governor and Council "for their perusal and proposals of amendment," and should be printed for the consideration of the people before being enacted into laws; and, except temporary acts, which after being laid before the Governor and Council, could, in case of sudden necessity, be passed by the General Assembly, such acts could not become laws until the next legislative session. Const. 1777, Chap. 2, Sec. 14. "In order that the freedom of this commonwealth may be preserved inviolate forever," provision was made for the election in March, 1785, and in every septenary thereafter, of a Council of Censors whose duty it was "to enquire whether the Constitution has been preserved inviolate, in every part; and whether the legislative and executive branches of government have performed their duty as guardians of the people, or assumed to themselves, or exercised, other or greater powers than they are entitled to by the Constitution." Con. 1777, Chap. 2, Sec. 44.

In discharge of the duties imposed upon them, the first Council of Censors, in their address to the freemen of the State, reviewed with considerable particularity the practices of the legislative and executive departments which they deemed censurable and pointed out changes in the frame of government to remedy the evils. They especially condemned "the fickleness of the Legislature and their want of deliberation in passing laws." Commenting on the inconvenience and expense to the State of the check upon hasty and ill-considered legislation intended by the 14th section of the frame of government, they concluded: "We cannot esteem the Legislature excusable in omitting it; and the notion of treating the general system of our statutes as temporary, we consider as an evasion of an article in the Constitution thought by the Convention to be of importance." As

required by the Constitution, the Council of Censors proposed amendments thereto by submitting a draft thereof revised to embody their recommendations, and called a convention, which convened in June 1786, to consider such recommendations. So far as material to the present inquiry, the Constitution as then revised contained the provision, for the first time expressed (though it may from the first have been implied), that the legislative, executive, and judiciary departments "shall be separate and distinct, so that neither exercise the powers properly belonging to the others." Const. as revised in 1786, Chap. 2, Sec. 6. This provision has ever since been a part of the Constitution, and is now Chap. 2, Sec. 5 of the revision of 1913. The executive check upon legislation (Chap. 2, Sec. 14 of the original Constitution) took this form: "To the end that laws, before they are enacted, may be more maturely considered, and the inconvenience of hasty determinations as much as possible prevented, all bills which originate in the Assembly shall be laid before the Governor and Council for their revision and concurrence, or proposals of amendment; who shall return the same to the Assembly, with their proposals of amendment (if any) in writing; and if the same are not agreed to by the Assembly, it shall be in the power of the Governor and Council to suspend the passing of such bills until the next session of the Legislature. Provided, that if the Governor and Council shall neglect or refuse to return any such bill to the Assembly, with written proposals of amendment, within five days, or before the rising of the Legislature, the same shall become a law."

That the evils of "hasty and crude determinations" in matters of legislation still persisted is manifested by the address to the people of the State of the second Council of Censors. "To remedy these inconveniences by introducing a more deliberate discussion in the proceedings of the Legislature," they proposed the addition of a Senate, having distinct power and an equal voice in all matters of legislation. This proposal met with scant favor in the Convention called in June, 1793, to consider their recommendations, but marks the beginning of a contest which, after repeated failures, resulted in the changes in the frame of government accomplished in 1836, presently to be noticed. As it was in substance uniformly connected with successive proposals for coordinate branches of the legislative department, it is well to notice in passing the provision recommended for executive

approval of legislation and the comments of the Council of Censors with respect thereto. Omitting the preamble, which was the same as in Chapter 2, Section 14, of the revised Constitution, it provided: ''Every bill that shall have passed the Senate and House of Representatives shall, before it becomes a law, be presented to the Governor * * * and Council for their approbation; if approved, * * * the Governor shall write on the bill approved; but if not approved, he shall within four days, Sundays excepted, return it with his objections in writing to that House in which it shall have originated, and in such case, it shall be the duty of that House to reconsider said bill, and if said bill shall then pass, it shall be sent, together with the objections, to the other House, who shall likewise reconsider said bill, and if it shall again pass in that House, it shall become a law of the State, notwithstanding the disapprobation of the Governor and Council.

''If any bill shall not be returned by the Governor, as aforesaid, within four days (Sundays excepted) after it shall have been presented to him, the same shall become a law, unless an adjournment of the Legislature shall prevent its return, in which case it shall not be a law.''

The intent of this proposal was set forth in the address of the Council of the Censors as follows: ''We have thought it inconsistent with the principles of a free government, that the executive should have a negative on the proceedings of the Legislature; nevertheless, as the executive have an opportunity of observing all difficulties, which arise in the execution of laws, and are the center of information, upon that subject, we judge it necessary, that the Legislature should be availed of such information:—we therefore propose that all acts, before they pass into laws, shall be laid before the executive for revision; they are, however, to make no leading propositions, but simply to state their objections, if any they find, with their reasons, in writing, to the Legislature; who still are to have the sole power of passing laws.'' Slade's State Papers, 547. The main features of the amendments proposed by the second Council of Censors were rejected, and the provision of the Constitution as revised in 1786 respecting the executive check on legislation was retained, though certain changes occasioned a renumbering of sections by which the latter became Section 16, Chapter 2, of the Constitution as revised in 1793. It stood unamended until the desired change in the frame of government was brought about in 1836, largely, it

is believed, through the efforts of Hon. Daniel Chipman, whose speech delivered before the Constitutional Convention of that year is a masterly review of the events leading up to and demanding the changes then proposed. He spoke ''as one having authority'' from intimate acquaintance with the affairs of state from the very beginning. To appreciate fully the significance of the changes intended by the amendments of 1836, one must acquaint one's self with conditions that prompted those changes; and no more reliable source of information can be found than Mr. Chipman's speech to the convention.

[1] It becomes apparent from an examination of the preceding events that the plan was to vest in a Senate such legislative powers as had theretofore been committed to the Governor and Council, which was to have coordinate powers with the House of Representatives in all matters of legislation, as a more efficient safeguard to deliberate action; and as a check against encroachments by the legislative department upon the prerogatives of the executive, as well as an additional security against ''the inconvenience of hasty determination,'' the executive was given the power of revision, not as a coordinate legislative branch, but in the exercise of a function in legislation peculiar to the executive department. We find here an application of the principle that under our constitutional system government is one of separate and distinct powers guarded by a series of checks and balances so adjusted as to avoid usurpation of power by any one branch. Article 11 of amendments adopted in 1836 is the same as Section 11, Chapter 2, of the Constitution as revised in 1913, except that the number of members necessary to pass an act over the Governor's objections has been increased, thereby strengthening the check on ill-advised legislation which the section affords. By the amended Constitution the General Assembly is vested with the supreme legislative authority, subject only to such restrictions and limitations as the Constitution imposes. Const. Chap. 2, Sec. 6; *Burlington* v. *Central Vermont Ry. Co.*, 82 Vt. 5, 9, 71 Atl. 826. The section of the Constitution under consideration is only designed as a restraint upon this power. The nature of the power therein conferred upon the Governor cannot be extended by construction, especially in view of the other provision that the departments shall be separate and distinct, ''so that neither exercise the powers properly belonging to the others.''

[2, 3]  With this general survey of the correlative powers of the General Assembly and the Governor in respect to legislation, we recur to the provisions of the Constitution relating to the approval of bills that have passed the General Assembly and have been presented to the Governor.  The petitionee asks us to consider the fact, asserted in his answer, and not controverted at the argument, that the officers charged by law with duties in respect thereto have given a practical construction to the constitutional provision favorable to his contention.  It is the undoubted rule that such a construction may be resorted to in aid of interpretation in case of doubtful meaning.  But when the language is unambiguous, its meaning cannot be modified or controlled by practice, however long continued.  In ascertaining the import and true interpretation of a written instrument, resort is first had to the obvious meaning of the language adopted, and if this is explicit and unequivocal, all inference by way of construction is excluded.  Should any part of the Constitution furnish answers in terms to the questions for decision, it would be not only unnecessary, but improper, to resort to extraneous aids to interpretation.  *State* v. *Stimpson*, 78 Vt. 124, 132, 62 Atl. 14, 1 L. R. A. (N. S.) 1153, 6 Ann. Cas. 639; Opinion of the Judges (unreported) 8 Governor and Council 279.

[4]  Does the Constitution authorize the Governor to approve and sign bills in his hands for revision after the final adjournment of the General Assembly?  The answer to this question is to be found in the document itself.  As we have seen, the function of the executive in this regard is not strictly legislative, and there is nothing in the Constitution making the exercise of the power dependent upon the General Assembly being in session.  Before the bill reaches the Governor it has received the sanction of the lawmaking branch of government and only lacks his approval to become a law.  The General Assembly has no further duty to perform with respect to the bill unless, perchance, the Governor sees fit to return it for reconsideration.  In the absence of action looking to reconsideration, the fate of the bill is determined by the Constitution.  It becomes a law in one of two ways:  (1) When signed by the Governor within a time fixed by the Constitution; (2) when not returned to the House in which it originated within the time fixed, unless its return is prevented by the adjournment of both houses within a certain time.  It should be remembered that the executive func-

tion under the constitutional system of this country, is not strictly a power of veto, though often inaccurately termed such, but rather a power of revision. *United States* v. *Weil,* 29 Ct. Cl. (U. S.) 523, 546.

Under our Constitution provision is made for both action and inaction on the part of the executive. If he approves the bill, he is to sign, and it becomes a law. If he disapproves, he is to return the bill, with his objections in writing, to the house in which it originated, which sets the machinery in motion for reconsideration. But that the executive may not defeat the legislative will through inaction, the Constitution provides a self-executing restriction. Failure to return the bill within five days (Sundays excepted) is made equivalent to approval. Finally, to secure to the Governor what was deemed a reasonable time at the close of the session to make known his objections to bills that he is unable to approve, any bill presented to him within three days before final adjournment is excepted from those that would become laws without his approval at the expiration of the five-day period. In other words, the provision relating to the effect of adjournment within three days is intended as a qualification of the provision respecting the effect of nonaction. That it was made as a concession in favor of the executive, and not as a limitation of his power of approval, becomes evident when we compare this provision with the provision as to executive nonaction for which it was substituted. Before the change, failure to return "within five days, or before the rising of the Legislature," was equivalent to approval, while now such is the effect unless the return is prevented by adjournment within three days. There can be no doubt that the Convention that adopted the amendment so understood it. It appears from a report of the proceedings that the amendment was objected to by some on the ground that it imposed a clog upon the Legislature, requiring both houses to sit three days after the accomplishment of their business, or else to suffer bills, which they deemed salutary, to be defeated at the will of the Governor. Report of Convention, Vermont Watchman for January 19, 1836. It is unreasonable to suppose that the Convention intended by the last clause of the article to curtail the power of approval given to the Governor in plain and unmistakable terms, and the opportunity of five working days in which to do so. Full force can be given to this clause without such an interpretation. The

effect of an adjournment of both houses when there are bills awaiting executive approval is to cut off the opportunity for reconsideration; but this is a privilege reserved to the legislative branch for its protection, and may be waived, as it is to all bills not in the Governor's hands more than three days at the time of adjournment. This brings us to the conclusion that there is no provision of the Constitution restricting the power of the Governor to approve bills after the adjournment of the Legislature, except that he is limited as to time to the period of five days (Sundays excepted) after the bill has been presented to him. No such provision is needed to make the plan of executive revision complete. To hold as the petitionee contends, would make it necessary to read into the Constitution a provision restricting its plain and express terms, wholly unnecessary to reasonable interpretation.

This view accords with that generally held by courts of other jurisdictions having similar constitutional provisions. There is a marked similarity in the language employed in the corresponding sections of nearly all state constitutions, doubtless due to the fact that the Federal Constitution was taken as the model in this particular. It is of historical interest to note that the phraseology of the provision for an executive check on legislation found in the Federal Constitution was doubtless taken from that respecting the Council of Revision found in the New York Constitution of 1777. See note, *United States* v. *Weil,* 29 Ct. Cl. (U. S.) 523, 546. It is said in the conclusion of a note to *Detroit* v. *Chapin,* 37 L. R. A. 391, 397, that California is the only state in which there is a decision in force against the power of the Governor to approve a bill after the Legislature adjourns, except Nevada, in which the question was decided in the territorial court before the adoption of the state constitution. The California case referred to is *Fowler* v. *Pierce,* 2 Cal. 165, decided in 1852, and was one of the first, if not the very first, case involving the question. No authority is cited, but reliance is placed upon a practical construction given to similar provisions by Congress and the Legislatures of other states. The decision is based upon the theory that the executive is, by the Constitution a component part of the lawmaking power; that in approving a law he is a part of the legislative branch of the government, which can only act in unison; that, whenever a part ceases to act, the whole becomes inoperative; that the executive act owes its vitality

to the existence of the legislative body; and that upon the adjournment of that body, the power ceases and all acts of a legislative nature are void. A similar result was reached in *Hardee* v. *Gibbs*, 50 Miss. 802, on the same line of reasoning; but in *State* v. *Coahoma County*, 64 Miss. 358, 1 South. 501, the court reversed its decision, saying with commendable frankness: "In *Hardee* v. *Gibbs*, this question was answered in the negative, but we have no hesitation to overrule this decision, which is not supported by reason or authority, and plainly shows a lack of attention to or comprehension of the language of the Constitution."

While the question whether the exercise of the so-called veto power is a legislative or an executive act has been and probably still is open to discussion (1 Watson on Con. 371), the proposition that it is so far legislative as to require its exercise when the Legislature is in session has long since been exploded. *People* v. *Bowen*, 21 N. Y. 517; *State ex rel. Belden* v. *Fagan*, 22 La. Ann. 543; *Lankford* v. *Somerset County Com'rs.*, 73 Md. 105, 20 Atl. 1017, 22 Atl. 412, 11 L. R. A. 491; *Seven Hickory* v. *Ellery*, 103 U. S. 423, 26 L. ed. 435; *La Abra Silver Mining Co.* v. *United States*, 175 U. S. 423, 453, 44 L. ed. 223, 20 Sup. Ct. 168; *United States* v. *Weil*, 29 Ct. Cl. (U. S.) 523.

*United States* v. *Weil, supra,* contains by far the most exhaustive discussion of the question of the right of an executive to sign a bill after adjournment of the Legislature to be found in the cases. The act in question was the Abandoned and Captured Property Act of March 12, 1863, signed by President Lincoln after the usual adjournment of Congress for the winter holidays, but within ten days from the time it was presented to him. The learning displayed in the opinion by Judge Nott and the unqualified approval of the argument and result reached by such eminent authority as Ex-Justice Strong of the United States Supreme Court and Judge Cooley entitles the case to great weight as an authority.

[5, 6] We come to the question whether the Constitution permits the Governor to give his assent to a bill which is presented to him after the Legislature has adjourned. The question has not often arisen, and there is not entire harmony in the decisions. The petitionee argues that it would be against public policy to permit this to be done, as there would be no limit to time within which such bills would become laws, resulting in serious confusion. But we have already held, as do practically

all the courts where the question has arisen, that the Constitution limits the time within which the Governor may give validity to a bill by signing it to a period of five days (Sundays excepted) from the time it is presented to him. However, there is nothing in the Constitution that nullifies his approval of a bill if done within the time allowed. Recalling that the essential thing to be done in order that a bill may become a law by the approval of the Governor is that it be signed by him within the time prescribed after being presented to him, and that after it has been presented no further action is required by the Legislature in respect of it, unless it be disapproved and returned for reconsideration, which the Legislature has waived by the adjournment, there would appear to be no grounds of public policy justifying a holding that the approval was a nullity. The observations of the court in *Lankford* v. *Somerset County Com'rs, supra,* are pertinent. "We must never forget that in sustaining a law which has been signed by the Governor we are giving effect to legislation which has received the sanction of all the branches of the lawmaking power. The Constitution has provided for defeating an act of Assembly when the Governor disagrees with the two houses of the Legislature; but where they all agree, it contains no provision for defeating their united will. The veto power has usually been regarded with jealously, and is restricted within well-defined limits; but there is no restraint on the Governor's right to agree with the Legislature. That has never been considered as a danger to be guarded against." When we consider that sometimes, perhaps usually, numerous bills, some of them important, containing many sections and intricate provisions, are passed in the closing days, often in the closing hours of the session, we discover no public interest to be served by advancing the time of their presentation to the Governor and thus shortening his time for revision.

The Constitution contains no provision respecting the time within which, or the means by which, a bill shall be presented to the Governor, leaving those matters within the control of the Legislature. By a joint rule of the Senate and House of Representatives it is provided that after a bill, or joint resolution requiring the approval of the Governor, shall have passed both houses, before being delivered to the Governor for his approval, it shall remain for three days in the files of the clerk of the house in which it originated, unless either house shall otherwise

order or the Governor shall sooner request it. But the clerk shall in the interval prepare and deliver to the executive department a true copy of the bill or joint resolution. Joint Rule 17. Another joint rule provides that the joint rules may be amended or suspended by a joint resolution at any time. Joint Rule 18. On Monday evening, March 28, a joint resolution, originating in the House, was passed by both houses directing the clerk of the House and the secretary of the Senate to transmit forthwith to the Governor all bills and resolutions which had passed both houses and were then in their files, and, during the remainder of the session, to likewise transmit to the Governor, as soon as received by them, all bills and resolutions that have passed both houses. An inspection of the journals shows that, of the four bills that reached the Governor after the Legislature adjourned, H-2 and H-98 were up for consideration in the House the last morning of the session on reports of committees of conference on the disagreeing votes of the houses, H-141 was passed in the House late in the afternoon of March 30, being up for consideration on the report of a committee of conference carrying numerous amendments; H-404, the general appropriation bill, appears to have been returned to the House on the last morning of the session with several proposals of amendment. Final adjournment in both houses was taken at 11 :30 o'clock in the forenoon. Considering the importance of the measures and the time required by the clerks because of amendments to put these bills in proper shape to be presented to the Governor, we are unable to say that they did not discharge the directions of the General Assembly with reasonable promptness. When the conduct of public officers is involved, all reasonable presumptions are indulged in favor of regularity. It will be presumed that when the House adjourned it knew these bills were in the hands of its clerk, and relied upon the instructions given to transmit them to the Governor. It will also be presumed that in presenting the bills to the Governor the clerk acted under authority and not as an intermeddler.

It is objected that, if the clerks can act in this matter after final adjournment, they can delay the presentation indefinitely. A sufficient answer to this objection is that public officers are bound to perform their duties with diligence and fidelity. That they may act otherwise cannot be assumed as a justification for denying them the right to act at all. Whatever views we may

entertain of the advisability of the course taken to present these bills to the Governor, we find no justification for holding that the Legislature acted without constitutional authority, which must be the test of our decision.

The conclusion we reach is supported by *Lankford* v. *Somerset County Com'rs, supra; Johnson* v. *Luers,* 129 Md. 521, 99 Atl. 710.; *Dow* v. *Beidelman,* 49 Ark. 325, 5 S. W. 297.

On the other hand, the opinion of the Justices of the Supreme Court of New Hampshire, 76 N. H. 601, 81 Atl. 170, is relied upon as authority to the contrary. This is an opinion given in response to inquiries of the Governor and Council relating to the validity of a certain act. The question was whether an act, invalid because the bill as signed by the Governor was not the bill passed by the Legislature, could be re-engrossed correctly and presented to the Governor for his approval, the Legislature having taken final adjournment. While such an opinion is not entitled to the weight of a decision, we have given attention to the argument of the Justices. The most that can be said is that the opinion raises a doubt as to how the Supreme Court of New Hampshire would dispose of the question here for decision. In reaching the conclusion that an act cannot be presented to the Governor for his signature in the peculiar circumstances stated in the inquiries, the Justices say that as the Constitution confers no authority upon any person to present bills to the Governor, they must be presented by the Lgislature, or by some person by authority derived from the Legislature. There a mistake had been discovered after the Legislature adjourned that made it desirable to have the act re-signed by the Governor; but, as no one was found to have authority from the Legislature to present the corrected bill for signature, the Justices were of the opinion that it could not be done. Whether the Legislature had constitutional power to confer the necessary authority was not considered, as the opinion expressly states.

[7] The result is that all the bills involved in this proceeding, save one, became valid laws when signed by the Governor; they having been approved by him within the time fixed by the Constitution. S-30, which was presented to the Governor March 30, and was signed April 6, more than five days after presentation (the intervening Sunday excepted) was not validated by the Governor's signature. If it became a law, it was by virtue of the other provision of the Constitution respecting a bill not

returned by the Governor.   But the bill having been presented
to him within three days before the adjournment of both houses,
could not thereby become a law, for the Constitution expressly
provides that in such case it shall not become a law.

   *Judgment that a mandamus issue directed to the said Harry
A. Black, as Secretary of State, commanding him to cause the
several acts of the General Assembly listed and described in the
petition, except the act therein described as S-30, to be engrossed
and promulgated as public acts, in accordance with the statutes
in such case made and provided.   Let neither party recover costs.*