HARRIS GILBERT, ROBERT WILLIS, HELEN ACKERMANN, JAMES O. WYATT, VALERIE HAYNES, GORDON MANZER, PATRICK RAGOSTA, GARRETT W. HAGEDORN, FRANCIS X. HERBERT, JANE BURGIO, ROSEMARY TOTARO AND COMMON CAUSE OF NEW JERSEY, PLAINTIFFS-APPELLANTS, v. ROBERT E. GLADDEN, JOHN J. MILLER, JR., CHRISTOPHER JACKMAN AND JOSEPH P. MERLINO, DEFENDANTS-RESPONDENTS, AND THE HONORABLE BRENDAN T. BYRNE, GOVERNOR OF NEW JERSEY, INTERVENOR-DEFENDANT-RESPONDENT.

Argued February 10, 1981—Decided July 29, 1981.

*Steven E. Pollan* argued the cause for appellants (*Pollan and Pollan*, attorneys; *Steven E. Pollan* and *Patricia A. Christoff*, Legal Asst. on the brief).

*Lawrence T. Marinari* argued the cause for respondents John J. Miller, Jr. and Christopher Jackman (*Stockman, Mancino, Marinari, Smithson, O'Donnell & Sypek*, attorneys).

*Leon J. Sokol* argued the cause for respondents Robert E. Gladden and Joseph P. Merline (*Greenstone & Sokol*, attorneys).

*Erminie L. Conley*, Assistant Attorney General, argued the cause for intervenor-respondent (*John J. Degnan*, Attorney General of New Jersey, attorneys; *Stephen Skillman*, Assistant Attorney General, of counsel; *William Harla*, Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

CLIFFORD, J.

This appeal concerns the process by which legislation becomes law in this state. Plaintiffs include two members of the New Jersey Senate, two members of the General Assembly, seven private citizens and taxpayers, and Common Cause of New Jersey. Defendants Gladden and Merlino are, respectively, Secretary and President of the New Jersey Senate; and defendants Miller and Jackman are, respectively, Clerk and Speaker of the General Assembly. By leave of court Governor Byrne appears as intervenor.

Plaintiffs' challenge centers on the constitutional provision governing presentment of bills to the Governor. Article V, section 1, paragraph 14 of the New Jersey Constitution of 1947

requires that "[e]very bill which shall have passed both houses shall be presented to the Governor." If he approves the bill, the Governor signs it and it becomes law. If the bill is disapproved, the Governor must return it, with his objections, to the legislative house from which it originated, within a specified time (generally, ten days after presentment if that house is in session and forty-five days after adjournment if that house is in adjournment on the tenth day after presentment).[1] The Legislature may then override the veto if two-thirds of the members of each house vote to pass the bill. There is one exception to the procedure: if the house is adjourned and the forty-fifth day thereafter falls "on or after the last day of the legislative year in which the second annual session was held," no special session may be convened.[2] Therefore, the bill cannot be returned to the Legislature and, if not signed, it does not become law.

Within this framework there has developed an unofficial custom of long duration, known as gubernatorial courtesy, whereby bills that have been passed in both houses of the Legislature are not presented to the Governor for signature or veto until the Governor requests them. Consequently, when the request for a bill is withheld and therefore presentation not made until forty-five days before the end of the second legislative session, at which time the legislative house is in adjournment *sine die*, the Governor can prevent the bill from becoming law merely by not signing it, inasmuch as the Legislature has no opportunity to override that result. This device, often referred to as New Jersey's version of the "pocket veto," is the focus of plaintiffs' complaint.

---

[1]The extended time period in case of adjournment seems to have been provided so that a special session can be convened to consider the returned bill.

[2]Each "Legislature" lasts two years. The first year is called the first session and the second is the second session. Bills and resolutions introduced during the first session remain valid and available for action only through the end of the second session. See *Manual of the Legislature of New Jersey* 194 (1981).

In particular, plaintiffs argue that the practice of gubernatorial courtesy permits the legislative process to be frustrated through this "pocket veto" technique; if the Governor anticipates a legislative override, he can avoid it simply by not calling for a bill until the forty-five days provision becomes operative. According to plaintiffs this circumvention of the Legislature's power to override a veto is contrary to the constitutional design found in Article V, section 1, paragraph 14 of the state Constitution. They would have us construe that paragraph as requiring the Legislature to present bills to the Governor "forthwith" in order to preclude such manipulation. Plaintiffs further argue that since the Constitution does not expressly permit discretion regarding the timing of the presentment of bills, neither the Governor nor the Legislature may forestall presentment.

On the other hand defendants contend that questions concerning the manner and time in which passed bills are presented to the Governor are essential to the workings of the legislative process; hence, absent any express constitutional or statutory criteria regulating the procedure, this case presents a nonjusticiable political question. Furthermore, they maintain that the lack of constitutional regulation of the procedure amounts to empowerment of the Legislature to promulgate its own regulations.

After discovery, plaintiffs moved for summary judgment and defendants filed a cross-motion seeking the same relief. The trial court granted defendants' application and entered judgment dismissing the complaint. Plaintiffs appealed. We granted direct certification, 85 *N.J.* 450 (1981), while this case was pending unheard in the Appellate Division. *R.* 2:12–1.

## I

We note at the outset that the justiciability inquiry must be distinguished from the issue of whether subject-matter jurisdiction exists. The latter question involves merely a threshold determination as to whether the Court is legally authorized

to decide the question presented. If the answer to this question is in the negative, consideration of the cause is "wholly and immediately foreclosed." See *Baker v. Carr*, 369 *U.S.* 186, 198, 82 *S.Ct.* 691, 699, 7 *L.Ed.2d* 663, 674 (1962). In respect of justiciability, however, the inquiry proceeds beyond the threshold determination "to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Id.* In the instant case it is the latter determination with which we are concerned.

## II

"The nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr, supra*, 369 *U.S.* at 210, 82 *S.Ct.* at 706, 7 *L.Ed.2d* at 682. In New Jersey the separation of powers is expressly established in Article III, paragraph 1 of the state Constitution:

> The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution. [*N.J. Const.* of 1947, Art. III, ¶ 1.]

The separation of powers doctrine is a principle shared by many other states as well as the federal government. See *David v. Vesta Co.*, 45 *N.J.* 301, 323 (1965). Its purpose is to safeguard the "essential integrity" of each branch of government. See *Massett Building Co. v. Bennett*, 4 *N.J.* 53, 57 (1950).[3]

---

[3]The doctrine of separation of powers does not, however, require an absolute division of powers among the three branches of government. *State v. Leonardis*, 73 *N.J.* 360, 370 (1977). In fact it necessarily assumes a cooperative effort among them. See *id.* at 371. See also *Knight v. Margate*, 86 *N.J.* 374, 387–388 (1981). Thus, an agreement between the Governor and Legislature that gives rise to a practice such as gubernatorial courtesy is not prohibited by the doctrine. Whether the judicial branch may review such agreements absent constitutional standards is the more difficult question and the one with which we are presently faced.

■ Deciding whether a matter presents a nonjusticiable political question is a "delicate exercise in constitutional interpretation" for which this Court is responsible as the ultimate arbiter of the Constitution of this state. See *Baker v. Carr, supra,* 369 *U.S.* at 211, 82 *S.Ct.* at 706, 7 *L.Ed.2d* at 682. The Supreme Court has provided us with guidance regarding the identification of political questions:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question. [*Baker v. Carr, supra,* 369 *U.S.* at 217, 82 *S.Ct.* at 710, 7 *L.Ed.2d* at 686.]

To justify dismissal based on nonjusticiability, one of these criteria must be inextricable from the facts and circumstances of the case in question. *Id.*

■ In this case the first criterion of *Baker v. Carr* provides the basis for our determination that plaintiffs' complaint presents a nonjusticiable political question. The "textually demonstrable constitutional commitment" of the question of presentment of bills to the Governor can be derived from proper consideration of two constitutional provisions. Article IV, section 4, paragraph 3 of the New Jersey Constitution grants each house of the Legislature the power "to determine the rules of its proceedings * * *." Neither that provision nor Article V, section 1, paragraph 14, which provides for presentment of bills to the Governor, limits the time within which presentment may be accomplished.

■ In the absence of constitutional or statutory standards, it is not the function of this Court to substitute its judgment for that of the Legislature with respect to the rules it has adopted or the procedures followed in giving effect to the constitutionally-declared scheme. See *In re Lamb,* 67 *N.J. Super.* 39, 59

(App.Div.), *aff'd* 34 *N.J.* 448 (1961).  Furthermore, since a state constitution, unlike its federal counterpart, is not a grant but a limitation of legislative power, *State v. Murzda*, 116 *N.J.L.* 219, 222 (E. & A.1935), the Legislature is invested with all powers not constitutionally forbidden.  *Gangemi v. Berry*, 25 *N.J.* 1, 11 (1957).  Thus, although the legislature is constitutionally required to present passed bills to the Governor, the timing of such presentment is discretionary, and a rule or practice delaying presentment is well within the legislative prerogative.[4]

The dissent contends that the custom of gubernatorial courtesy "subverts the carefully considered framework that establishes the joint responsibility of the executive and legislative branches of our State government for the enactment of laws." *Post* at 301.  This argument ignores the plain fact that the custom itself represents a determination by the legislative branch on how best to exercise its share of this joint responsibility.  The Legislature is free to vote for presentment of a bill to the Governor at any time after passage, regardless of whether the Governor calls for the bill.  It may even vote to override a contrary decision of its leadership in this regard.  It freely chooses, however, to delay presentment until the Governor indi-

---

[4]Our dissenting colleagues assert, *post* at 302, that the only sensible construction of the constitutional provision is that bills passed by both houses of the Legislature must be presented to the Governor for his action within a reasonable time after their passage.  Reasonableness should be determined in light of the two purposes that delay in presentation may legitimately serve:  preparation of bills for presentation and careful study of bills by the Governor.

This is followed shortly by a disclaimer.  *Post* at 284 n. 5.  For this Court to impose a reasonableness standard on the timing of presentment, as the dissent suggest, would obtrude the judiciary into the legislative process in a manner that would do greater violence to the constitutional framework than that which the dissent attributes to the use of gubernatorial courtesy. For example, it would require courts to make political value judgments regarding the priority of bills so as to evaluate the order in which the Governor reviews them and the amount of time he should spend studying them.  A more blatant breach of the separation of powers is difficult to imagine.

cates his desire to deal with the bill. Thus, gubernatorial courtesy exists only by virtue of the consent of the Legislature as a whole. The fact that this custom may lead to extended delay in the enactment of certain bills in no way detracts from its constitutionality. Rather, the Legislature's acquiescence in such a result is merely indicative of that branch's view of its role in the "joint responsibility" for the enactment of our laws. Moreover, the legislative history of the presentment provision indicates that this very arrangement constitutes the "carefully considered framework" envisioned by the framers.

The state constitution of 1776 contained no provision for the gubernatorial veto of enacted legislation. Hence, bills were not presented to the Governor for signature. The Constitution of 1844 required the presentment of bills to the Governor and also provided for gubernatorial veto, legislative override of that veto, and a pocket veto if legislative adjournment prevented return of the bill. See *N.J.Const.* of 1844, Art. V, ¶ 7. The 1947 Constitution closely tracks the language of this paragraph; the presentment requirement has remained unchanged. See *N.J.Const.* of 1947, Art. V, § 1, ¶ 14.[5]

The minutes of the 1947 Constitutional Convention reveal that the framers were well aware of the custom of gubernatorial courtesy. At one point former Governor Larsen was questioned about it:

> MR. BARTON: To hark back to the question of signing bills that Senator Farley brought up, is there anything that stands out in your mind during your term as Governor that you now consider a sore spot in connection with the signing of bills—as to when they are received, signed, failure to sign, or anything connected with the Executive phase, anything outstanding?
>
> GOVERNOR LARSON: I never had any.

---

[5]The original paragraph was changed only to increase the votes needed to override a gubernatorial veto, to require that an override be considered no earlier than the third day following return of the bill, to increase the time during which the Governor may consider bills after presentment, and to alter the procedure for returning a bill when the Legislature is adjourned. *Compare N.J.Const.* of 1947, Art. V, § 1, ¶ 14 *with N.J.Const.* of 1844, Art. V, ¶ 7.

MR. BARTON: Is there any reform that would work better, in the light of some instance that came up during your term?

GOVERNOR LARSON: I never had any trouble either in the Legislature or as Governor.

MR. FELLER: Under the Constitution, the Governor now has five days in which to sign or veto a bill.

GOVERNOR LARSON: If he receives it. He doesn't have to receive it; he can wait a couple of months. He simply doesn't ask for it from the Legislature.

CHAIRMAN: I think a lot of people feel that many of these bills signed are unconstitutional.

MRS. BARUS: Couldn't the Legislature swamp the Governor by sending them all at once and there would not be enough hours for him to read them if he sat up all night?

GOVERNOR LARSON: The point that Senator Van Alstyne raised is that some people question the constitutionality of these laws because they are handled that way.

CHAIRMAN: The Governor may have been studying them for two months, but the original bill doesn't get into his hands.

[V New Jersey Constitutional Convention of 1947 (Committee on the Executive, Militia, and Civil Officers 22–23) (S. Goldmann & H. Crystal eds. 1953)]

The issue was again raised in the questioning of former Governor Moore:

MR. GEORGE H. WALTON: Governor Moore, in allowing the Governor ten days in which to consider bills passed by the Legislature, is it your thought that the subterfuge that has grown up over the terms of many Governors, of allowing the Governor to get around that five-day rule by having him call for bills as he wants to consider them—do you think that should be dropped and, if you do, is ten days sufficient?

GOVERNOR MOORE: Ten days is not sufficient if you want to consider bills very carefully, but ten days would be helpful and probably more easily gotten than anything else. I just want to point out to you that if there is trouble between the Legislature and the Governor—it often happens; I tried to get along with them, trying to be a peaceable soul—but if you don't, I know that on occasion they come in with these bills, hundreds of them, and then say, "Send them over to that So-and-So and let's see what he is going to do." In five days he can't possibly. How could he? And that happens.

MR. WALTON: There were 400 bills at the end of this session. It would be humanly impossible, to my mind, to consider them in ten days.

GOVERNOR MOORE: They could have dropped them in as they went along. I suppose they did, but ten days is better than five.

MRS. BARUS: Wouldn't you think 30 would probably be somewhat more reasonable, especially at the end of the session?

GOVERNOR MOORE: Then again, you run into the idea that the governor might be somewhat "hipped" against the man who sponsored the bill, and maybe it would be a bill that should be signed quickly, and the Governor could punish

him by holding him up 30 days. I think ten days would answer the purpose fairly well.
[*Id.* at 68–69]

It is apparent from these discussions that serious thought was given to a constitutional prohibition of gubernatorial courtesy. Taken together with the evidence that the framers deliberated on the problem, their failure ultimately to change the present-ment language demonstrates a considered decision to retain the practice. It further appears that the increase of the number of days after presentment during which the Governor may consider a bill was not intended implicitly to preclude gubernatorial courtesy. An intention to abolish a well-established and widely recognized practice would have been expressed more perspicu-ously.[6] Rather, the most sensible explanation for the extended time period is that it merely provides an additional safety margin for the Governor in the event of a break-down in the arrangement between the Executive and the Legislature.

### III

■ In the alternative, plaintiffs contend that in *N.J.S.A.* 1:2–5 the Legislature has statutorily required the presentment of passed bills to the Governor forthwith. That enactment reads as follows:

*On the passage* of any bill, or the adoption of any joint resolution, by both Houses of the Legislature, *the same shall be delivered to the Governor* or person administering the government, who, if he shall approve such bill or joint resolution, shall sign and deliver the same to the Secretary of State, to be filed in his office, in such order that the laws and joint resolutions of each sitting of the Legislature shall be kept separately, according to the year in which they shall be passed, and not delivered to any person whatsoever, but safely kept by the Secretary of State in his office, and not suffered to be taken or removed therefrom on any pretext whatsoever. [Emphasis added.]

Plaintiffs assert that the emphasized language constitutes a significant change from that used in the Constitution and that

---

[6]Such a change could easily have been wrought, for example, by providing for the "immediate" or "forthwith" presentment of passed bills to the gover-nor.

the only reasonable meaning attributable to that change in language is the establishment of a temporal limitation on the presentment of bills to the Governor. We are unpersuaded.

As with the constitutional presentment provision, this statute contains no explicit limitations on the method for presenting bills to the Governor. Furthermore, the only purpose of this statute was to insure the permanent safeguarding of the statute laws of our State. See *In re Public Utility Board*, 83 *N.J.L.* 303, 309 (Sup.Ct.1912) (construing the predecessor statute to *N.J.S.A.* 1:2–5). Such a statute would be a most inappropriate vehicle by which to abolish the practice of gubernatorial courtesy, and we decline to attribute such a purpose to it in the absence of an unmistakable expression of legislative intent.

## IV

In response to defendants' contention that gubernatorial courtesy is necessary to insure adequate time for the Governor to consider passed bills, plaintiffs characterize the practice as a "verbal conspiracy," a "pernicious practice," and "trickery." They have provided us with examples of bills whose presentation has been delayed for over eighteen months because of the Governor's failure to call for them and the Legislature's acceding to the practice. They claim that eighty-six bills were subject to pocket veto at the end of the 1978 legislative session. Although such occurrences arguably evince a questionable use of gubernatorial courtesy, the selection of the manner in which elected representatives exercise their legitimate powers short of a constitutional or statutory violation cannot be remedied by the courts. *Kligerman v. Lynch*, 92 *N.J.Super.* 373, 376–77 (Ch.Div. 1966), *cert.* den., 389 *U.S.* 822, 88 *S.Ct.* 49, 19 *L.Ed.*2d 74 (1967). Whether gubernatorial courtesy is to be further sanctioned or finally condemned must be determined either by the Legislature

or at the bar of public opinion. See *Passaic County Bar Ass'n v. Hughes*, 108 *N.J.Super.* 161, 173 (Ch.Div.1969).[7]

## V

Because we find this case presents a nonjusticiable political question the resolution of which is constitutionally committed to the Legislature, we do not reach the additional questions raised on appeal. The trial court's judgment dismissing plaintiffs' cause of action is affirmed. No costs.

PASHMAN and SCHREIBER, JJ., dissenting.

The issue raised by the plaintiffs is whether the New Jersey Constitution vests the Legislature with plenary and unrestricted authority to fix any period of time within which a duly passed bill must be presented to the Governor. The majority holds that it does. We disagree. We fail to see how this case presents a nonjusticiable political question, as the majority concludes. Judicial review is not only constitutionally required here, but it is especially appropriate in this case where the political branches have undertaken an informal practice that undermines the carefully detailed constitutional scheme which permits the Legislature to override a gubernatorial veto. Because we find no

---

[7]The appropriateness of extra-judicial resolution of the questions surrounding the practice of gubernatorial courtesy is illustrated by the recent legislative action taken in this regard. On June 9, 1980 the State Senate adopted Senate Rule 141, which provides for presentment of bills to the Governor on the forty-fifth day following passage unless the Governor requests a delay. The Assistant Attorney General represented at oral argument that Governor Byrne has informally agreed to comply with the spirit of this Senate Rule by calling for Assembly bills within forty-five days of passage. Furthermore, by virtue of *Assembly Concurrent Resolution No.* 117, approved by the Assembly on November 24, 1980 and by the Senate on December 19, 1980, a proposed constitutional amendment on the subject will be placed before the electorate this coming November. That amendment requires presentment of a bill "before the close of the calendar day next following" final passage and gives the Governor forty-five days to consider the bill, with certain exceptions as expiration of the second session of a particular Legislature approaches.

excuse for refusing to perform this Court's appointed task of reviewing the constitutionality of this practice, we dissent.

## I

Relying on the factors for identifying a political question set forth in *Baker v. Carr*, 369 *U.S.* 186, 217, 82 *S.Ct.* 691, 710, 7 *L.Ed.2d* 663 (1962), the majority purports to find a " 'textually demonstrable constitutional commitment' of the question of presentment of bills to the Governor," in Article IV, § IV, par. 3, the rules of proceedings clause, and Article V, § I, par. 14, the presentment clause. Based on its interpretation of those provisions, the majority concludes that the timing of presentment is a nonjusticiable political question whose resolution is committed *solely* to legislative discretion. Ante at 282.

The timing of presentment is indeed a "political question" in the same sense that the promotion of the public's health, safety and general welfare is: both are matters for which the Legislature has primary responsibility. But the fact that the Legislature has discretion concerning the timing of presentation does not render the matter a political question in the sense that the courts may not review the Legislature's action to determine whether it has exceeded the scope of its authority. Without more persuasive evidence than the majority is able to marshall, we would not so readily abdicate our role as the final arbiter of constitutionality.

> The judicial branch of the government has imposed upon it the obligation of interpreting the *Constitution* and of safeguarding the basic rights granted thereby to the people. In this sphere of activity the courts recognize that they have no power to overturn a law adopted by the Legislature within its constitutional limitations, even though the law may be unwise, impolitic or unjust. The remedy in such case lies with the people. But when legislative action exceeds the boundaries of the authority delegated by the *Constitution,* and transgresses a sacred right guaranteed to a citizen, final decision as to the invalidity of such action must rest exclusively with the courts. It cannot be forgotten that ours is a government of laws and not of men, and that the judicial department has imposed upon it the solemn duty to interpret the laws in the last resort. However delicate that duty may be, we are not at liberty to surrender, or to ignore, or to waive it. [*Asbury Park Press, Inc. v. Woolley*, 33 *N.J.* 1, 12 (1960) (emphasis in original)]

In order to decide whether the timing of presentment is a political question within the meaning of *Baker v. Carr*, that is, whether the Constitution has committed the timing of presentment to the *unreviewable* discretion of the Legislature, it is necessary to examine the two constitutional provisions upon which the majority relies. The first of these provisions, Article IV, § IV, par. 3, empowers each house of the Legislature to "determine the rules of its proceedings." In other contexts, the courts of this State have held that the Legislature's exercise of its power to determine the rules of its proceedings is subject to judicial review for constitutionality. *See Gewertz v. Joint Legislative Committee on Ethical Standards*, 132 *N.J.Super.* 435, 436 (App.Div.), certif. den., 68 *N.J.* 156 (1975); *In re Lamb*, 67 *N.J.Super.* 39, 59 (App.Div.), aff'd, 34 *N.J.* 448 (1961); *Werts v. Rogers*, 56 *N.J.L.* 480, 631 (Sup.Ct.1894). *See also United States v. Smith*, 286 *U.S.* 6, 52 *S.Ct.* 475, 76 *L.Ed.* 954 (1932); *United States v. Ballin, Joseph & Co.*, 144 *U.S.* 1, 5–6, 12 *S.Ct.* 507, 509, 36 *L.Ed.* 321 (1892). In each of these cases, the court found that the challenged legislative action was constitutionally permissible, either because it fell within the scope of power delegated to the Legislature or because the Constitution did not prescribe any limitation on the exercise of the specific power in question. None of these cases suggested that the Legislature was the sole monitor of its compliance with constitutional standards, as the majority apparently holds today by stating that the timing of presentment is nonjusticiable and committed solely to legislative discretion.

The constitutional provision on which the majority places primary emphasis is the presentment clause itself, Art. V, § I, par. 14. This clause states that "[e]very bill which shall have passed both houses shall be presented to the Governor." From the language of the clause it is clear that the Constitution makes the Legislature responsible for determining when to present bills to the Governor. But there is nothing in the presentment clause, and the majority provides no evidence, that suggests that the Legislature's authority to decide when to present bills is

absolute and beyond judicial review. On the contrary, based on our reading of the available constitutional history and our understanding of the role of presentment in this State's constitutional scheme for law making, *see* part III *infra*, we are compelled to conclude that the Constitution requires the Legislature to present bills within a reasonable period of time. Whether the Legislature has exceeded its constitutional authority by adopting a custom of unreasonable delay in presentation is a matter for judicial determination, not a nonjusticiable political question. In the absence of clear evidence,[1] we are unwilling to adopt a construction of the presentment clause that would both eliminate this Court's role in preserving the Constitution's scheme for the enactment of legislation and permit the legislative leaders and Governor to disregard the important principle of representative democracy embodied in that scheme.

Because we conclude that the timing of presentment is subject to judicial review, we would address plaintiffs' claim and decide what limits the Constitution imposes on the timing of presentation and whether gubernatorial courtesy transgresses those limits.

## II

Before reaching the merits of this case, it is necessary to address two other defenses raised by defendants. Defendants argue that as legislators and officers of the Legislature they are granted immunity from civil suit by the Speech and Debate Clause of the New Jersey Constitution of 1947, Art. IV, § IV, par. 9. They also contend that plaintiffs have failed to state a claim either for a writ of mandamus or a declaratory judgment.

---

[1] *Cf. Powell v. McCormack*, 395 *U.S.* 486, 547, 89 *S.Ct.* 1944, 1977, 23 *L.Ed.*2d 491 (1969) (if intent of framers of Constitution is unclear or ambiguous, constitutional language should be construed narrowly because of fundamental principle that people should select those by whom they will be governed).

## A

The New Jersey Constitution provides that "for any statement, speech or debate in either house or at any meeting of a legislative committee, [members of the Senate and General Assembly] shall not be questioned in any other place." Art. IV, § IV, par. 9. This Court has never had the occasion to construe this clause, but the Speech and Debate Clause in the federal Constitution has received considerable attention in the United States Supreme Court. *See, e. g., Eastland v. United States Servicemen's Fund,* 421 *U.S.* 491, 95 *S.Ct.* 1813, 44 *L.Ed.2d* 324 (1975); *Doe v. McMillan,* 412 *U.S.* 306, 93 *S.Ct.* 2018, 36 *L.Ed.2d* 912 (1973); *Gravel v. United States,* 408 *U.S.* 606, 92 *S.Ct.* 2614, 33 *L.Ed.2d* 583 (1972); *Powell v. McCormack,* 395 *U.S.* 486, 89 *S.Ct.* 1944, 23 *L.Ed.2d* 491 (1969); *Tenney v. Brandhove,* 341 *U.S.* 367, 71 *S.Ct.* 783, 95 *L.Ed.2d* 1019 (1951); *Kilbourn v. Thompson,* 103 *U.S.* 168, 26 *L.Ed.* 377 (1881). Relying on this federal precedent, defendants contend that the presentment of bills falls within the sphere of legitimate legislative activity for which legislators are immune from suit and that this immunity extends to employees of the Legislature like Miller and Gladden, who are, respectively, Clerk of the General Assembly and Secretary of the Senate. We disagree, at least as regards the immunity of Miller and Gladden.

The Speech and Debate Clause is a means of protecting the integrity of the legislative process by preventing the "intimidation of legislators by the Executive and accountability before a possibly hostile judiciary." *Gravel v. United States, supra,* 408 *U.S.* at 617, 92 *S.Ct.* at 2623. To achieve this end, "voting by Members and committee reports are protected," *id.* at 624, 92 *S.Ct.* at 2626, and "a Member's conduct at legislative committee hearings, although subject to judicial review in various circumstances, as is legislation itself, may not be made the basis for a civil or criminal judgment against a Member because that conduct is within the 'sphere of legitimate legislative activity,' " *id.* In determining whether conduct other than literal speech or

debate falls within the scope of the immunity, a court must decide whether the conduct is

> an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House. [*Id.* at 625, 92 *S.Ct.* at 2627; *see Eastland v. United States Servicemen's Fund, supra,* 421 *U.S.* at 504, 95 *S.Ct.* at 1821; *Doe v. McMillan, supra,* 412 *U.S.* at 313, 93 *S.Ct.* at 2025]

Besides legislators, the Speech and Debate Clause also protects certain legislative personnel, such as personal aides, *Gravel v. United States, supra,* 408 *U.S.* at 618, 92 *S.Ct.* at 2623, and committee counsel. *Eastland v. United States Servicemen's Fund, supra,* 421 *U.S.* at 507, 95 *S.Ct.* at 1823, to the extent that the aide's conduct would be "a protected legislative act if performed by the Member himself." *Gravel v. United States, supra,* 408 *U.S.* at 618, 92 *S.Ct.* at 2623. But a legislative employee is not immune when he performs or fails to perform a nonlegislative act in accordance with an invalid legislative directive. *See Doe v. McMillan, supra,* 412 *U.S.* at 315, 93 *S.Ct.* at 2026 (no immunity for publishing actionable material beyond reasonable requirements of legislative function); *Powell v. McCormack, supra,* 395 *U.S.* at 504–05, 89 *S.Ct.* at 1955 (Sergeant at Arms, Doorkeeper and Clerk of House not immune from suit by Representative wrongfully excluded from House); *Kilbourn v. Thompson, supra,* 103 *U.S.* at 205, 26 *L.Ed.* 377 (House's Sergeant at Arms may be sued for false imprisonment after executing arrest warrant issued by House).

It makes no difference that the legislative employee may be acting or refusing to act pursuant to an express order of the Legislature or that the legislators who ordered his conduct may themselves be immune from suit concerning their decision. *Doe v. McMillan, supra,* 412 *U.S.* at 316 n.10, 93 *S.Ct.* at 2026 n.10; *Powell v. McCormack, supra,* 395 *U.S.* at 504, 89 *S.Ct.* at 1955; *Kilbourn v. Thompson, supra,* 103 *U.S.* at 204–05, 26 *L.Ed.* 377. The Speech and Debate Clause is not meant to bar judicial review of the constitutionality of a legislative decision. Rather,

it insures that legislators are not hindered in the performance of their office by the burden of defending themselves. *See Powell v. McCormack, supra,* 395 *U.S.* at 505, 89 *S.Ct.* at 1955; *Tenney v. Brandhove, supra,* 341 *U.S.* at 377, 71 *S.Ct.* at 788. This purpose is not thwarted if legislative employees are made responsible for their own unconstitutional acts so long as they are not themselves engaged in a legislative function. If immunity did attach, it is conceivable that legislative action that is executed by legislative employees would be immune from judicial review in spite of its effect on individual rights.

Judged by these standards, the presentment of bills to the governor is not a legislative function protected by the Speech and Debate Clause. It can hardly be characterized as "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings," *Gravel v. United States, supra,* 408 *U.S.* at 625, 92 *S.Ct.* at 2627. Therefore, at least as regards those defendants, Gladden and Miller, who are responsible for presenting bills to the Governor under the legislative rule governing their respective chambers, *see* Joint Rule 8, the Speech and Debate Clause does not bar this action.[2]

B.

Defendants also contend that plaintiffs have not satisfied the requirements for mandamus because the act of presentment is discretionary rather than ministerial, or for a declaratory judgment because there is no case or controversy. Because we find that there is a case or controversy and, consequently, that a declaratory judgment is appropriate, we need not decide whether mandamus would also be warranted. Confronted with an authoritative judicial statement of their constitutional obligations concerning the presentation of bills, we expect the legisla-

---

[2]Regardless of the immunity of the legislators and legislative employees, the action could still be maintained against intervenor-defendant Governor Byrne, who is not protected by the Speech and Debate Clause.

tive employees and the Governor would comply without the need for more coercive relief.

It has long been the rule that the remedy provided by the Declaratory Judgment Act, *N.J.S.A.* 2A:16–50 to –62, may not be invoked in the absence of an actual controversy. *See New Jersey Turnpike Authority v. Parsons,* 3 *N.J.* 235, 240 (1949). This rule derives from the policy that courts should "refrain from rendering advisory opinions, from deciding moot cases, or generally from functioning in the abstract." *Id.*

Contrary to the belief of the court below, plaintiffs do not request an advisory opinion concerning the legality of gubernatorial courtesy. The case does not present an abstract or hypothetical question; the plaintiffs have alleged specific instances in which the Legislature has delayed the presentation of bills for lengthy periods.

Even if the particular bills that had not been presented at the time the complaint was filed have now been presented to the Governor, there remains an actual controversy because the Governor and Legislature can continue to follow this practice.[3]

---

[3]On June 9, 1980, the Senate adopted Senate Rule 141 concerning presentation of bills to the Governor. This rule provides:

Each passed bill or joint resolution in the custody of the Secretary of the Senate shall be presented to the Governor on the 45th day following its passage or on the 15th day following its passage if passed on or after November 1 of a second annual session of a two-year Legislature; *provided, however, that the Secretary shall not deliver any passed bill or joint resolution if so ordered by a resolution of the Senate or by the President pursuant to a request from the Governor made to the President,* prior to the expiration of the prescribed time period, to hold the bill or joint resolution until a specified date. All such communications from the Governor shall be entered in the Journal of the Senate. [emphasis added]

However, the Senate's adoption of this rule does not render moot the constitutional issues raised by this appeal. First, the Assembly has not adopted such a rule, choosing instead to submit the question to a constitutional referendum, Assembly Concurrent Resol. No. 117 (1980). Second, and more important, Senate Rule 141 does not eliminate the potential for unreasonably lengthy delays in presentation. Because the rule permits the President of the Senate, at the Governor's request, to delay presentment to

Thus, the constitutionality of delaying the presentation of bills passed by both houses of the Legislature is an issue "capable of repetition, yet evading review," *Southern Pacific Terminal Co. v. ICC*, 219 *U.S.* 498, 515, 31 *S.Ct.* 279, 283, 55 *L.Ed.* 310 (1911), which should not be deemed moot or advisory. *Cf. Roe v. Wade*, 410 *U.S.* 113, 125, 93 *S.Ct.* 705, 712, 35 *L.Ed.*2d 147 (1973) (termination of plaintiff's pregnancy did not render her challenge to anti-abortion statute moot or a request for advisory opinion); *Moore v. Ogilvie*, 394 *U.S.* 814, 816, 89 *S.Ct.* 1493, 1494, 23 *L.Ed.*2d 1 (1969) (challenge to petition requirement after election completed). Because the problem may persist until resolved, we should use this opportunity to define the scope of the Legislature's constitutional authority to pass rules regulating the manner in which it presents bills to the Governor for his consideration.

### III

Turning, then, to the merits of the present controversy, plaintiffs challenge the constitutionality of "gubernatorial courtesy," a practice whereby bills that have passed both houses of the Legislature are not officially presented to the Governor for his consideration until he calls for them. The practice is apparently informal, being based solely on unwritten agreement and custom, but it is sufficiently established to be the subject of academic study and criticism, *see* Eagleton Institute of Politics, Rutgers–The State University, *The New Jersey Legislature* 8–10 (1963).

The challenged practice arises out of those terms of the State Constitution that establish the procedures for the Governor's consideration and approval or veto of bills that have passed both houses of the Legislature. *N.J.Const.* (1947), Art. V, § 1, par. 14(a). According to this section of the Constitution, "[e]very bill

---

some future date, the very abuses challenged by plaintiffs in this case will still be possible. Furthermore, we are unable to predict what Governors will do in the future.

which shall have passed both houses shall be presented to the Governor." The Governor has ten days following such presentation either to sign the bill or to return it to the Legislature with his veto. If he does neither, and the Legislature is still in session on the tenth day, the bill automatically becomes law. If, on the tenth day, the Legislature is temporarily adjourned, the Governor has until the first day of the resumption of its session to sign the bill or return it to its house of origin. If on the tenth day after presentation the Legislature has completed its two-year session, the Governor has forty-five days to act before the bill becomes law. However, "whenever the forty-fifth day, Sundays excepted, after adjournment sine die of a regular or special session shall fall on or after the last day of the legislative year in which the second annual session was held . . . any bill not signed by the Governor within such 45-day period shall not become a law." *Id.*

It is this last-quoted provision that enables the Governor to "pocket veto" legislation. The Governor is empowered by the Constitution to veto any bill that passes both houses, but ordinarily he must return any vetoed legislation "with his objections, to the house in which it shall have originated." *Id.* The Legislature, in its turn, can override a gubernatorial veto by a two-thirds vote. *Id.* If, however, the bill is presented to the Governor fewer than ten days before the final adjournment of a legislative session *and* such final adjournment occurs fewer than forty-five days before the end of the legislative year, the Governor can pocket veto a bill merely by inaction, such pocket veto not being subject to legislative override.

Only bills "presented" to the Governor at the very end of a two-year Legislature will potentially be subject to pocket veto. But the practice of gubernatorial courtesy, by enabling the Governor to determine when bills will be "presented" to him, theoretically makes it possible for him to pocket veto *any* bill simply by declining to call for it until the end of the two-year legislative session.

The merits of the present controversy turn, then, on the correct construction of the constitutional provision regarding "presentation" of bills. The text, as quoted above, baldly states that "[e]very bill which shall have passed both houses shall be presented to the Governor." Does the lack of any qualification of the term "presented" mean that the Legislature may, in cooperation with the Governor, delay the presentation of bills for months or even years with the result that the constitutional framework for the enactment of laws in this State is subverted? We think not.

Because of the absence of express constitutional standards, the majority concludes that the Legislature has complete discretion concerning the timing of presentment. We agree that the Legislature has discretion, but this discretion is not unfettered.

There are, of course, good reasons for there to be some discretion respecting the presentation of bills. One, emphasized by the Governor, is to allow the Governor and his staff enough time to study a bill before deciding whether to approve or veto it. In the normal course of things the Governor has only ten days following the bill's presentation to act upon it. Even assuming that his staff is able to monitor the progress of many bills through the Legislature and their passage does not come unexpectedly, ten days may often not suffice for careful consideration of complex bills or even simple ones if a large number are presented at once, as often occurs towards the end of a session. *See Cenarrusa v. Andrus,* 99 *Idaho* 404, 407, 582 *P.2d* 1082, 1085 (1978); *People ex rel. Petersen v. Hughes,* 372 *Ill.* 602, 608, 25 *N.E.2d* 75, 78 (1939).

Some flexibility regarding presentation may also be necessary from the standpoint of the Legislature. In particular, some time may be needed after a bill has passed both houses in order to examine and authenticate the final bill before presenting it to the Governor. *See U. S. v. Kapsalis,* 214 *F.2d* 677, 680 (7th Cir. 1954), *cert.* den., 349 *U.S.* 906, 75 *S.Ct.* 583, 99 *L.Ed.* 1242 (1955); *Hartness v. Black,* 95 *Vt.* 190, 114 *A.* 44, 49 (1921).

None of this, however, justifies the practice of subjecting the presentation of bills to prolonged delay, regardless of their complexity, in order to enable the Governor to pocket veto them. We have no doubt that the abuse which results from delaying the presentation of substantial numbers of bills to enable the Governor to pocket veto them, without needing to explain his reasons or to give the Legislature an opportunity to override his veto, is unconstitutional.

Plaintiffs paint a compelling picture of such abuse. According to an affidavit submitted with their brief, 86 bills were pocket vetoed by the Governor at the end of the 1976–77 legislative session. By contrast, only 134 bills had been pocket vetoed during the 15 years from 1948–63. *The New Jersey Legislature, supra,* at 8A–9A. They also point out that there were, as of December 16, 1979, 163 bills awaiting presentation to the Governor, of which 8 had been passed more than 500 days previously, 10 more than 400 days previously, 12 more than 300 days previously, and 24 more than 200 days previously. Plaintiffs offer several examples of bills awaiting presentation to illustrate the fact that complexity of legislation is not the only criterion for delaying presentation. For example, a bill to require municipalities and counties to deposit their funds in interest-bearing accounts had, by the end of 1979, been awaiting presentation for 550 days. Another bill, which would make it a disorderly persons offense for deliverymen to walk across lawns rather than use sidewalks, had been awaiting presentation for 293 days. These are hardly complex pieces of legislation requiring time for study.

We would hold that gubernatorial courtesy, when practiced as a means of unreasonably delaying the presentation of bills, is unconstitutional. We find support for this position in the Constitution itself, in logic and in the decisions of other courts that have considered the problem.

Article V, § 1, par. 14 first appeared in substantially the same form in the New Jersey Constitution of 1844, and was modeled

after Art. 1, § 7, cl. 2 of the United States Constitution. A review of the proceedings at the New Jersey Constitutional Convention of 1844 suggests the delegates expected that enacted bills would be presented to the Governor within a short period of time. The delegates were concerned with the power and control to be vested in the executive. The desirability of granting the Governor a veto power and the voting requirement appropriate for overriding that veto were discussed extensively. *See Proceedings of the New Jersey State Constitutional Convention of 1844*, 175–205 (New Jersey Writers' Project ed. 1942). To allay the fears of some, reference was made to the federal experience in which only 20 out of 7,000 bills had been vetoed. *Id.* at 203–04. Attempts to require a two-thirds or three-fifths vote to override a veto were defeated, and the delegates adopted a majority vote instead. *Id.* at 205. The debate centered on the concept that one person, the Governor, should not be able to frustrate the will of the people. *Id.* at 175–205. Permitting the Governor to determine, without limitation, the time for presentation conflicts with the delegates' desire to protect against arbitrary action.

The minutes of the 1947 Constitutional Convention reflect the existence of a practice of presenting bills when requested by the Governor. *State of New Jersey Constitutional Convention of 1947*, 22–23, 68–69 (S. Goldmann & H. Crystal, eds. 1953). However, there is no indication that bills were not being submitted within a reasonable period of time. The only problem discussed was the refusal at times of an unfriendly Legislature to honor the Governor's request. Since the Constitution then required the Governor to sign or veto a bill within five days, such a refusal had the effect of imposing on him the obligation to act on a large number of bills within a five-day period. *Id.* at 66, 68. This situation was alleviated by increasing the time for gubernatorial action to ten days. *N.J.Const.* (1947), Art. V, § 1, par. 14. If gubernatorial courtesy had been utilized in an unfettered manner, it would have been pointless to extend the

period from five to ten days, since the Governor could have called for the bills at his own pace.[4]

It is thus incontrovertible that the abuse of gubernatorial courtesy violates the spirit if not the letter of our State Constitution. It subverts the carefully considered framework that establishes the joint responsibility of the executive and legislative branches of our State government for the enactment of laws. The majority's suggestion that such a subversion of the constitutional scheme is permissible as long as the Legislature knowingly acquiesces in the custom, *ante* at 283–284, ignores the fact that the Legislature too is bound by our State Constitution.[5] To permit the practice to continue unchecked flies in the face of logic as well, since its end result could be the pocket veto by the

---

[4]It is interesting to note that nothing in the federal experience indicates that bills had not been presented to the President within a reasonable period of time. The United States Supreme Court has explained that the ten-day period in the federal Constitution's presentation provision is to give the President time to examine the bills and Congress the opportunity to repass bills over his objection. *See The Pocket Veto Case (Okanogan Indians v. United States)*, 279 *U.S.* 655, 677–78, 49 *S.Ct.* 463, 465–66, 73 *L.Ed.* 894 (1929). The federal practice has been to present the measure to the President after its passage without waiting for the call of the President. *Eber Bros. Wine & Liquor Corporation v. United States*, 337 *F.*2d 624, 631–32 (Ct. of Claims 1964), *cert. den.*, 380 *U.S.* 950, 85 *S.Ct.* 1082, 13 *L.Ed.*2d 968 (1965). It has been stated that presentation of a bill "occurs usually within a day or two or at most a few days, after its passage by both Houses of Congress...." Miller, *Some Legal Aspects of the Visit of President Wilson to Paris*, 36 *Harv.L.Rev.* 51, 68 (1922). Nonetheless, cooperation between the executive and legislative branches is not precluded. For example, presentation has been delayed when the President has been out of the country. *Eber Bros., supra*, 337 *F.*2d at 633; Corwin, *The President, Office and Powers*, 281 n.45 (1957). There is nothing in the federal experience or practice to suggest that an arbitrary delay in presentation of bills is constitutionally permissible.

[5]Apparently, not all our State legislators acquiesce in the custom of unlimited gubernatorial courtesy. In fact, a number of the plaintiffs in this case are State legislators themselves. It is not uncommon for the legislators to criticize the Governor for "sitting on" passed bills and refusing to act one way or another. *See* Zarate, "Despite a Few Spats, Byrne and the Legislature Remain Pals," *Star-Ledger*, July 12, 1981, at Sec. 3, p. 3, col. 2.

Governor of any and every bill passed by the democratically elected representatives of the people.

At the same time, the inexpediency of interpreting the Constitution as requiring presentation "forthwith" or within a specified number of days, as plaintiffs argue, is equally clear. Complex legislation or a flood of bills passed over a short period may require some time for preparation to present to the Governor and for his study. Thus, the only sensible construction of the constitutional provision is that bills passed by both houses of the Legislature must be presented to the Governor for his action within a reasonable time after their passage. Reasonableness should be determined in light of the two purposes that delay in presentation may legitimately serve: preparation of bills for presentation and careful study of bills by the Governor.

This conclusion is supported by the case law of other jurisdictions. The federal Constitution and many state constitutions resemble New Jersey's Constitution in their failure to specify when, following passage, presentation is to be made. *See State v. Ryan,* 123 *Kan.* 767, 256 *P.* 811, 812 (1927). Yet other courts that have considered the question have said that presentation must be made within a reasonable time. *See Richards Furniture Corp. v. Board of County Comm'rs of Anne Arundel County,* 233 Md. 249, 263, 196 *A.*2d 621, 628 (1964); *Opinion of the Justices,* 106 *N.H.* 402, 405, 213 *A.*2d 415, 417 (1965); *U. S. v. Pruitt,* 121 *F.Supp.* 15, 25 (S.D.Tex.1954), aff'd o. b., 217 *F.*2d 648 (5th Cir. 1954), *cert.* den., 349 *U.S.* 907, 75 *S.Ct.* 584, 99 *L.Ed.* 1243 (1955); *see also People ex rel. Petersen v. Hughes, supra,* 25 *N.E.*2d at 79 (state constitution sets limits to Legislature's discretion in presentation of bills to Governor); *cf. U. S. v. Kapsalis, supra,* 214 *F.*2d at 681 (bills presented after *sine die* adjournment of legislature must be presented within a reasonable time); *accord, Preveslin v. Derby & Ansonia Developing Co.,* 112 *Conn.* 129, 151 *A.* 518, 521 (1930); *contra, City of Rye v. Ronan,* 67 *Misc.*2d 972, 976, 325 *N.Y.S.*2d 548, 552 (Sup.Ct.1971), aff'd, 40 *App.Div.* 950, 338 *N.Y.S.*2d 384 (App.Div.1972); *Cenarrusa v. Andrus, supra,* 582 *P.*2d at 1087.

For the reasons explained above, we hold that any exercise of "gubernatorial courtesy" that leads to an unreasonable delay is unconstitutional, and that all bills that are passed by the Legislature must be presented to the Governor within a reasonable time. We would, out of respect for separation of powers principles and out of deference to their expertise, leave it to the Legislature and the Governor to make the initial determination concerning how much time is needed, as a general matter, between passage and presentation.[6] However, our courts should always remain open to review, if necessary, the constitutionality of the scheme adopted to insure that it respects our basic principles of republican government.

*For affirmance* —Chief Justice WILENTZ and Justices SULLIVAN and CLIFFORD—3.

*For reversal* —Justices PASHMAN and SCHREIBER—2.

---

[6]In view of our position on this issue, it is baffling to note the majority's assertion that we would "require courts to make political value judgments regarding the priority of bills so as to evaluate the order in which the Governor reviews them and the amount of time he should spend studying them," *ante* at 283 n.4. On the contrary, we ask only that the Legislature adopt its own *rules* providing for presentation within a reasonable time. The rules in general would be subject to judicial review, if challenged, and not the reasonableness of the presentation of each individual bill.