Opinión de conformidad y concurrente emitida por el
Juez Asociado Señor Fuster Berlingeri.
Estoy conforme con lo que considero que son los dos aspectos medulares del caso de autos examinados tanto en la opinión del Tribunal como en la opinión de conformidad de la Juez Asociada Señora Rodríguez Rodríguez.
En primer lugar, y lo más esencial, estoy conforme en cuanto a que en el caso de autos la Cámara de Representantes de Puerto Rico (Cámara de Representantes) no podía reconsiderar el proyecto de ley que ya había aprobado el 21 de junio de 2006 si no contaba con el consentimiento del Senado de Puerto Rico (Senado). Cuando la Cámara de Representantes realizó tal reconsideración el 27 de junio de 2006, el proyecto de ley que aquí nos concierne ya había sido aprobado íntegramente, sin cambio alguno, por el Senado. Este otro cuerpo de la Asamblea Legislativa le había impartido su aprobación al proyecto en cuestión el 25 de junio de 2006. Por lo tanto, al momento en que la Cámara de Representantes pretendió reconsiderarlo —dos días más tarde— el proyecto referido ya estaba fuera de su jurisdicción. Era entonces un proyecto de la Asamblea Legislativa y por ello la Cámara de Representantes no podía reconsiderarlo si el Senado no consentía a ello.
En segundo lugar, también estoy conforme en cuanto a que ahora procede, al amparo de la Sec. 19 del Art. Ill de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, que se someta al Gobernador de Puerto *471 Rico el proyecto de ley que fue aprobado por ambas cámaras legislativas. Como la reconsideración de la Cámara de Representantes del proyecto aludido fue inoficiosa, por la razón indicada en el párrafo anterior, sólo subsiste válidamente el proyecto original según aprobado por la Cámara y el Senado el 21 y 25 de junio, respectivamente. Este único proyecto válido debe ser sometido al Gobernador para su consideración, según lo dispone claramente la propia Constitución.
Por lo demás, no estimo necesarias las otras consideraciones que aparecen en las opiniones referidas. El hecho medular e innegable es que hubo un importante proyecto aprobado por ambas Cámaras. Si el presidente de la Cámara de Representantes lo quiere firmar o no, es para mí de poca consecuencia. Al amparo de la innegable autoridad de este Foro, lo que procede es que ordenemos remitirlo al Gobernador para su consideración, sin mayores contemplaciones. Si tenemos autoridad para decidir que la reconsideración en cuestión fue inoficiosa, ciertamente la tenemos también para enviar al Gobernador el proyecto en cuestión por nuestra cuenta para que éste proceda a considerarlo.
Opinión de conformidad emitida por la
Juez Asociada Señora Rodríguez Rodríguez.
Tenemos ante nuestra consideración una controversia relacionada con el trámite legislativo seguido para la aprobación del proyecto de reforma contributiva, conocido como Ley de Justicia Contributiva de 2006. Debemos determinar si, una vez un proyecto de ley es aprobado por ambas cámaras legislativas, la cámara de origen puede reconsiderar su votación original e introducir enmiendas al proyecto ya aprobado sin la anuencia del otro cuerpo.
Estoy conforme con la determinación que hoy anuncia *472 este Tribunal, pero dada la importancia que reviste para nuestro ordenamiento constitucional la controversia planteada en este caso, hemos decidido suscribir esta opinión de conformidad para expresar nuestros criterios sobre las disposiciones constitucionales que hoy interpretamos por primera vez.
I
Luego de un largo y controversial proceso, el pasado 21 de junio de 2006 la Cámara de Representantes de Puerto Rico (Cámara de Representantes) aprobó el Sustitutivo P. de la C. 2193, conocido como la Ley de Justicia Contributiva de 2006. Este proyecto propone enmendar la Ley Núm. 120 de 31 de octubre de 1994, conocida como el Código de Rentas Internas de Puerto Rico, para establecer, entre otras cosas, un impuesto general de ventas en Puerto Rico. El proyecto aprobado fue remitido al Senado de Puerto Rico (Senado) para su aprobación. Este cuerpo lo aprobó sin enmiendas el 25 de junio.
Así las cosas, y siguiendo el trámite ordinario, el Senado envió, a través de su Secretaría, el proyecto enrolado a la Cámara de Representantes. Tomamos conocimiento judicial de que, inmediatamente después de la aprobación por el Senado, comenzó una discusión pública sobre la tasa del impuesto sobre la venta que fuera aprobada. Por un lado, el Gobernador de Puerto Rico así como el Presidente del Senado señalaron públicamente que el proyecto aprobado por ambas cámaras proveía un impuesto sobre la venta del siete por ciento; mientras, la Cámara de Representantes reclamaba que el por ciento de impuesto aprobado fue de un cinco punto cinco, que se distribuía en un cuatro por ciento para el Gobierno central y un uno punto cinco por ciento para los municipios.
Trabada así esta agria controversia, el 27 de junio de 2006 el Presidente de la Cámara de Representantes con *473 vocó a dicho cuerpo a una sesión ordinaria para reconsiderar la medida. Durante la sesión, la portavoz de la mayoría parlamentaria solicitó dejar sin efecto la Sec. 40.1 del Reglamento de la Cámara de Representantes para la Decimocuarta Asamblea Legislativa de 13 de enero de 2005 (Reglamento de la Cámara de Representantes).(1)
El 28 de junio de 2006 el Gobernador de Puerto Rico le envió una carta al Presidente de la Cámara de Representantes en la que le solicitaba que le remitiera el proyecto aprobado el 21 de junio de 2006 para su firma. El señor Gobernador le indicó al Presidente de la Cámara que era su deber ministerial firmar el proyecto aprobado y remitirlo al Primer Ejecutivo. En su carta, el Gobernador informó que era su intención firmar el Sustitutivo P. de la C. 2193 una vez lo recibiera.
Al día siguiente, el Gobernador de Puerto Rico, Hon. Aníbal Acevedo Vilá, y el portavoz de la minoría en el Senado, Hon. José Luis Dalmau Santiago, acudieron ante nosotros mediante un recurso de mandamus. Se incluyeron como demandados al Presidente de la Cámara de Representantes, Hon. José F. Aponte Hernández, al Secretario de la Cámara de Representantes, Ledo. José Enrique Meléndez, al Presidente del Senado, Hon. Kenneth McClintock Hernández, y al Senado de Puerto Rico.
En el escrito presentado se impugnó la acción de la Cámara de Representantes de reconsiderar el Sustitutivo P. de la C. 2193. Se solicitó como remedio que se expidiese un mandamus en que se les ordenara a los presidentes de los cuerpos legislativos firmar el proyecto según fue aprobado originalmente por ambas cámaras y remitirlo al señor Gobernador. Presentado el recurso de mandamus, les con *474 cedimos a los demandados un término de dos días, hasta el 1 de julio de 2006, para que comparecieran a expresar su criterio sobre el recurso instado.
Oportunamente los demandados comparecieron. Por un lado, el Senado se allanó a la solicitud del Gobernador. La Cámara de Representantes, por su parte, compareció y argumentó, esencialmente, que el recurso no era justiciable por plantear una cuestión política. Adujo también que los demandados no tenían legitimación activa y que la controversia no estaba madura por no haber culminado aun el proceso de la aprobación de las enmiendas realizadas al Sustitutivo P. de la C. 2193.
La controversia medular en este caso gira en torno al proceso de aprobación de una medida legislativa, su naturaleza y sus requerimientos, así como sobre la facultad de uno de los cuerpos para reconsiderar su votación y enmendar el proyecto en cuestión, luego de que la otra cámara aprobara el proyecto de ley que le fuera remitido sin enmienda alguna. Ello, cuando la actuación de la cámara de origen se da al final de la sesión legislativa, específicamente, tres días antes del cierre de sesión y sin haber solicitado previamente la anuencia del Senado para proceder con la reconsideración.
Veamos entonces.
II
El auto de mandamus es altamente privilegiado y de naturaleza discrecional. 32 L.P.R.A. see. 3421. Véanse: Ortiz v. Muñoz, Alcalde de Guayama, 19 D.P.R. 850 (1913); Dávila v. Superintendente de Elecciones, 82 D.P.R. 264 (1960); Báez Galib y otros v. C.E.E. II, 152 D.P.R. 382 (2000). El mandamus está concebido “para obligar a cualquier persona ... a cumplir un acto que la ley particularmente le ordena como un deber resultante de un ... cargo o función pública, cuando ese deber no admite discreción en *475 su ejercicio, sino que es ministerial”. (Escolio omitido.) D. Rivé Rivera, Recursos Extraordinarios, San Juan, Programa de Educación Jurídica Continua, Facultad de Derecho de la Universidad Interamericana de Puerto Rico, 1989, pág. 85.
Un acto es ministerial cuando la ley prescribe y define el deber que tiene que ser cumplido de forma tal que no encierra el ejercicio de la discreción o juicio. Por el contrario, si la ley le permite al funcionario decidir si cumple o no el acto interpelado, entonces no estamos ante un acto ministerial y, por consiguiente, está fuera del ámbito del recurso de mandamus. La decisión de lo que es, o no, “un deber ministerial” no es algo que se pueda determinar mediante la aplicación de una fórmula inflexible. Partido Popular v. Junta de Elecciones, 62 D.P.R. 745, 749 (1944). Tal determinación ha de surgir de la evaluación de todos los elementos de juicio disponibles para auscultar el propósito y significado del estatuto en cuestión. Hernández Agosto v. Romero Barceló, 112 D.P.R. 407, 418 (1982).
La exigencia de que el deber ministerial esté definido en una disposición legal “no impide ni exime a los tribunales de la obligación de interpretar la Constitución y las leyes. La procedencia del auto de mandamus no está proscrita por el hecho de que se requiera una interpretación judicial del deber ministerial invocado”. Báez Galib y otros v. C.E.E. II, ante, pág. 393. “[M\andamus will not be precluded solely because judicial construction is required to clarify the duty. Thus, mandamus will lie not only where a federal officer has failed to comply with a specific statutory or regulatory directive, but also where a constitutionally mandated duty has not been performed.” (Enfasis nuestro.) Rosati v. Haran, 459 F. Supp. 1148, 1151 (D. N.Y. 1977)).
Por lo tanto, el hecho de que tengamos que interpretar el deber ministerial invocado no impide que se expida el auto solicitado en circunstancias apropiadas. Por ello, no es determinante para que proceda el recurso que el deber *476 ministerial suija de forma clara y expresa de las disposiciones legales aplicables, pues como hemos dicho anteriormente, tal requisito reduciría nuestra función de interpretar la Constitución y las leyes. Hernández Agosto v. Romero Barceló, ante, pág. 418.
La autoridad de este Tribunal para conceder el recurso de mandamus en jurisdicción original es harto conocida. De acuerdo con la See. 5 del Art. V de la Constitución del Estado Libre Asociado, “[e]l Tribunal Supremo ... podr[á] conocer en primera instancia de ... aquellos ... recursos y causas que se determinen por ley”. Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 395. Véanse: Dávila v. Superintendente de Elecciones, ante; Noriega v. Hernández Colón, 135 D.P.R. 406, 447-448 (1994); Arts. 649-650 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sees. 3421-3422.
Para ejercitar nuestra jurisdicción original en un recurso de mandamus, hemos establecido que deben cumplirse los factores siguientes: que la petición de mandamus vaya dirigida contra uno de los principales funcionarios del Gobierno, se levanten cuestiones de gran interés público y que el asunto requiera una solución pronta y definitiva. Dávila v. Superintendente de Elecciones, ante, págs. 274-275; Gierbolini Rodríguez v. Gobernador, 129 D.P.R. 402, 409 (1991).
Asimismo, la ley dispone que no proceda la utilización del mandamus cuando exista otro recurso adecuado y eficaz en el curso ordinario de la ley. 32 L.P.R.A. see. 3423. Véase, además, Alvarez de Choudens v. Tribunal Superior, 103 D.P.R. 235 (1975). Se requiere, además, que el peticionario le haya hecho un requerimiento previo al demandado para que éste cumpla con el deber que se le exige. En la petición se debe alegar tanto el requerimiento como la negativa, o la omisión del funcionario en darle curso. Rivé Rivera, op. cit, pág. 125.
A la luz de la normativa expuesta, podemos concluir que en el presente caso procede la invocación de nuestra juris *477 dicción original para establecer los méritos del auto de mandamus solicitado.(2) En el presente caso, el problema planteado requiere una solución pronta y definitiva a través de nuestra intervención directa en un asunto que es, esencialmente, de naturaleza constitucional y que tiene hondas repercusiones para la marcha ordenada de la cosa pública.
III
La Constitución del Estado Libre Asociado de Puerto Rico dispone que en Puerto Rico el Poder Legislativo lo ejerce la Asamblea Legislativa, la cual está compuesta por dos Cámaras: el Senado y la Cámara de Representantes. Art. Ill, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1. Es decir, la Constitución delega todo el poder legislativo en la Asamblea Legislativa; limitado dicho poder únicamente por las restricciones que impone la Carta de Derechos. Nogueras v. Hernández Colón, 127 D.P.R. 405 (1999). Véase R. Serrano Geyls, Derecho constitucional de Estados Unidos y Puerto Rico, San Juan, Ed. C. Abo. P.R., 1986, Vol. I, págs. 206-209 y 337-338. La Asamblea Legislativa de Puerto Rico no es un cuerpo de poderes enumerados. Por antonomasia, la Asamblea Legislativa es el poder gubernamental más político y, en principio, el que debe ser más representativo de todos.
La función esencial de este poder gubernamental, y que condiciona su denominación, es efectivamente la de emitir las leyes. Véase La nueva Constitución de Puerto Rico, San Juan, Ed. U.P.R., 1954, pág. 422.
La Constitución del Estado Libre Asociado prescribe las formalidades procesales que deben seguir los cuerpos legis *478 lativos con todo proyecto para procurar su aprobación.(3) Los reglamentos de las respectivas Cámaras, aprobados en virtud de lo dispuesto en la Constitución, implementan estas disposiciones y proveen el trámite correspondiente. Así también lo hacen varias disposiciones del Código Político. Véase 2 L.P.R.A. see. 182 et seq.
En la medida en que la aprobación de una pieza legislativa se aparte de lo dispuesto en la Constitución, reglamento o estatuto, corresponderá a la Rama Judicial pasar juicio sobre lo acontecido y determinar el efecto de tal desviación. Solamente el incumplimiento con alguno de los requisitos específicos dispuestos en la Constitución para la aprobación de legislación justificaría un decreto de que la medida fue aprobada en contravención a la Carta Suprema. Véanse: United States v. Munoz-Flores, 495 U.S. 385, 391 esc. 4 (1990); L.H. Tribe, American Constitutional Law, 3ra ed., Nueva York, Ed. Foundation Press, 2000, Sec. 3-13, pág. 380.
Veamos entonces algunas de las características sobresalientes del trámite de aprobación de medidas.
IV
A. El trámite para la aprobación de una pieza legislativa, a grandes rasgos, es el siguiente:
*479 El proceso de aprobación se inicia, evidentemente, con la presentación de proyectos y resoluciones en la Oficina de Actas y Récord de la Cámara de Representantes o en su contraparte la Oficina de Trámite y Récord del Senado de Puerto Rico. Presentado un proyecto de ley, se le asigna un número a través del cual se habrá de conocer durante todo el proceso legislativo, y se imprime con la numeración asignada y la referencia a la Cámara que lo origina.(4) El proyecto numerado e impreso se remite a la comisión con jurisdicción para su consideración. Véase, para una discusión más detallada del proceso en Puerto Rico, N. Rigual, El Poder legislativo de Puerto Rico, Río Piedras, Ed. U.P.R., 1961, Cap. 5. Véanse, además: A. Mikva y E. Lane, An Introduction of Statutory Interpretation and the Legislative Process, Nueva York, Aspen Publishing, 1997; 1 Sutherland Statutory Construction Sec. 9.1 et seq. (2002); www. camaraderepresentantes. org.
La comisión, a su vez, determina el curso de acción que habrá de proseguir el referido proyecto. Una vez la comisión concluye sus trabajos y prepara su informe favorable, con o sin enmiendas, se envía una copia a la Comisión de Reglas y Calendario. Esta última decide si el proyecto se lleva al hemiciclo para su discusión y eventual votación y cuándo ocurrirá esto.
Aprobada la medida por el cuerpo de origen, se imprime nuevamente tal y como fue aprobada, y el Secretario de ese cuerpo envía una copia al Secretario del segundo cuerpo con la petición de que sea considerada por dicho cuerpo.
El trámite que se prosigue en el segundo cuerpo es idéntico al seguido en el primer cuerpo. Cuando la medida se aprueba, se reimprime en su forma enrolada.(5) Si la me *480 dida fue aprobada sin enmiendas, se envía a los Presidentes de ambas Cámaras para su firma y remisión al Gobernador para la acción final.
Si, por el contrario, la medida es aprobada con enmiendas, se envía al cuerpo de origen para su concurrencia con las enmiendas introducidas. Una vez éste concurra, ambos presidentes firman la medida y se envía al Gobernador para el trámite final.(6)
Este último trámite —la firma de los presidentes de los cuerpos legislativos— no es un requisito de exigencia constitucional, de la misma forma que no lo es bajo la Constitución de Estados Unidos.(7) Éste, sin embargo, es de importancia, ya que la firma en un proyecto enrolado atestigua que fue aprobado por cada cámara de acuerdo con el procedimiento constitucional para la aprobación de medidas. Sutherland, supra, Sec. 15.1, pág. 814. En ese sentido, son eminentemente acertadas las siguientes ex-presiones del Tribunal Supremo de Estados Unidos en el caso seminal Field v. Clark, 143 U.S. 649, 672 (1892):
The signing by the Speaker of the House of Representatives, and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses ... through their presiding officers, to the President, that a bill, thus attested, has received, in due form, the sanction of the *481 legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him. (Enfasis nuestro.)
La firma del proyecto enrolado permite, entonces, remitirlo al Gobernador para que éste pueda descargar su obligación constitucional de, con su firma, convertir la medida aprobada en ley si esa es su intención o, por el contrario, vetarla. Art. Ill, Sec. 19, Const. E.L.A., L.P.R.A., Tomo 1. Adviértase que la Constitución dispone que sólo se conviertan en ley aquellas medidas “aprobadas” por una mayoría de los miembros que componen cada cámara.
En resumen, el proceso de verificación de la aprobación de la ley mediante la firma del proyecto enrolado por los presidentes de ambos cuerpos, constituye el paso previo para que el Gobernador pueda descargar su prerrogativa constitucional de aprobar o desaprobar la medida remitida.
Pasamos ahora a discutir tres aspectos específicos del proceso de aprobación de legislación que inciden sobre la controversia formulada en este caso; son éstos: la firma y remisión al Gobernador, la aprobación por el Gobernador y, finalmente, el proceso de reconsideración.
B. Descrito el trámite legislativo, veamos ahora si la firma y remisión al Gobernador de un proyecto legislativo son deberes ministeriales. Desde antaño se ha entendido que la procedencia de un mandamus responde, no a la naturaleza del puesto que ocupa la persona obligada, sino al carácter de la acción solicitada. Este principio se remonta al propio Marbury v. Madison, 5 U.S. 137, 170 (1 Cranch 1803), donde el Tribunal expresó:
It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done, that the propriety or impropriety of issuing a mandamus is to be determined.
Ello significa que atribuirle responsabilidades a un pre *482 sidente cameral no las convierte necesariamente en deberes discrecionales.
La posición predominante en la jurisprudencia estadounidense se ha encaminado a sostener que la firma y remisión por parte del presidente legislativo es un deber ministerial o discrecional, según haya o falte el elemento de discreción. Así ha expresado el Tribunal Supremo de Ohio que, debidamente aprobado un proyecto de ley, su firma y remisión son deberes ministeriales:
... the constitutional responsibility of the presiding officers of each house to sign a certification where all of the procedural requirements for passage have been met is a ministerial duty. It is mandatory. It cannot be used as a veto power or a power with which to thwart the prompt passage of legislation. Maloney v. Rhodes, 345 N.E.2d 407, 414 (Ohio 1976).
En cambio, los deberes de firmar y remitir un proyecto de ley se han estimado como discrecionales cuando la determinación de si el proyecto fue debidamente aprobado exige el ejercicio legítimo de discreción.(8) Ex parte Echols, 39 Ala. 698 (1866), nos sirve de ejemplo. Un representante de Alabama solicitó que el Tribunal le ordenara al Speaker de la Cámara de Representantes que remitiera cierto proyecto de ley al Senado. El proyecto se había aprobado con cuarenta y siete votos a favor y veintidós en contra. Empero, el Speaker lo había declarado vencido, con el subsiguiente apoyo de la Cámara, por entender que la Constitución exigía una supermayoría de dos terceras partes. Al denegar el remedio solicitado, el Tribunal expresó, y citamos in extenso:
The speaker decided, that the bill had not passed by a vote of two-thirds of that branch of the legislature; and an appeal was taken from that decision, to the house, and the house *483 sustained the decision of the speaker. This was a question certainly within the jurisdiction of the speaker and house to pass upon, and is not a mere ministerial duty, but one that pertains to their legislative functions, and is one over which the house has exclusive jurisdiction. No other department of the government can revise its action in this respect, without a usurpation of power.
This court will not interfere with either of the other coordinate departments of the government, in the legitimate exercise of their jurisdiction and powers, except to enforce mere ministerial acts required by law to be performed by some officer thereof; and not then, if the law leaves it discretionary with the officer or department. To this extent, and no farther, do the decisions of this court go, upon this branch of the subject. Ex parte Echols, ante, págs. 699-700.
State v. Bolte, 52 S.W. 262 (Mo. 1899), también resulta ilustrativo. Allí, un Senador de Missouri instó un mandamus para que se ordenara, inter alia, que el Presidente de dicho cuerpo firmara un proyecto de ley y lo enviara a la Cámara de Representantes. El proyecto se había originado en el Senado y había sido objeto de un informe de conferencia que aprobaron ambas cámaras. No obstante, el Senado sometió el proyecto a una votación final, en la cual recibió diecisiete votos favorables de los treinta y cuatro Senadores electos. El Presidente pro tempore del Senado declaró derrotado el proyecto al invocar una disposición constitucional que exigía el apoyo mayoritario. Tras citar extensamente de Ex parte Echols, ante, el Tribunal concluyó:
So, in the case at bar, the most that can be said in support of relator’s contention is that the presiding officer of the senate was in error in ruling that the bill was not passed upon the confirmation by that body of the report of the conference committee with respect thereto, and in putting it to a vote of the senate. It was with respect to a matter which came strictly within the line of his duties as the presiding officer of the senate, and not merely ministerial. His action required the exercise of judgment and discretion, and was not simply perfunctory. State v. Bolte, ante, pág. 265.
*484 Conviene observar cómo los criterios de la jurisprudencia citada armonizan con la función de las firmas presidenciales en nuestro ordenamiento parlamentario. Hemos visto que no se trata de un mecanismo cuyo propósito es conceder a los líderes legislativos una última oportunidad de evaluar, en los méritos, las medidas que hayan recibido el apoyo correspondiente de los representantes o senadores. Su propósito es atestiguar que determinado proyecto fue aprobado debidamente. Resulta lógico, entonces, que la discreción conferida se limite al supuesto de que sea necesario juzgar si el proyecto fue debidamente aprobado, y que ante el evidente acato de los requisitos procesales, cese la discreción.
Debemos tener presente, claro está, que alguna discreción legislativa existe con respecto al momento de la remisión de los proyectos. Al precisar su ámbito de operación, resultan útiles las siguientes expresiones del reconocido tratado Sutherland Statutory Construction:
Some state constitutions also prescribe the method and time within which presentment shall be made. Where there is no express constitutional provision most courts require that bills be presented to the executive with reasonable promptness after adjournment and in a manner that accords with reasonable business practice. Reasonable diligence in preparing bills for transmission and actually transferring them to the custody of the chief executive’s office should fulfill the constitutional requirement. (Énfasis nuestro y escolios omitidos.) Sutherland, ante, Sec. 16.1, págs. 851-852.(9)
Por lo tanto, somos del criterio que en esta esfera opera *485 un estándar de razonabilidad, por lo cual no es apropiado fijar de antemano un término fijo; todo habrá de depender de las circunstancias del momento. La razonabilidad, como la Naturaleza, es una nube mutable que siempre y nunca es igual. R.W. Emerson, Essays: First Series and Second Series, Nueva York, Gramecy Books, 1993, Cap. 18.-
C. La Sec. 19 del Art. Ill de la Constitución del Estado Libre Asociado ordena que el proyecto de ley aprobado sea remitido al Gobernador una vez es firmado por los presidentes de los cuerpos. Esta sección dispone:
Cualquier proyecto de ley que sea aprobado por una mayoría del número total de los miembros que componen cada cámara se someterá al Gobernador y se convertirá en ley si éste lo firma o si no lo devuelve con sus objeciones a la cámara de origen dentro de diez días (exceptuando los domingos) contados a partir de la fecha en que lo hubiese recibido.
Cuando el Gobernador devuelva un proyecto, la cámara que lo reciba consignará las objeciones del Gobernador en el libro de actas y ambas cámaras podrán reconsiderar el proyecto, que de ser aprobado por dos terceras partes del número total de los miembros que componen cada una de ellas, se convertirá en ley.
Si la Asamblea Legislativa levanta sus sesiones antes de expirar el plazo de diez días de haberse sometido un proyecto al Gobernador, éste quedará relevado de la obligación de devolverlo con sus objeciones, y el proyecto sólo se convertirá en ley de firmarlo el Gobernador dentro de los treinta días de haberlo recibido.
Toda aprobación final o reconsideración de un proyecto será en votación por lista. (Enfasis nuestro.) Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 381.
La disposición constitucional antes transcrita es un claro ejemplo de que el poder de legislar, conforme la estructura constitucional establecida, es un poder compartido por los poderes políticos del Estado. La Sec. 19 del Art. Ill de la Constitución, ante, a la sazón, impone deberes y obligaciones recíprocas al Gobernador y a la Asamblea Legislativa. E.g.: The Pocket Veto Case, 279 U.S. 655, 678 (1929); Myers v. United States, 272 U.S. 52, 123 (1926); *486 INS v. Chadha, 462 U.S. 919, 951 (1983). Es, entonces, en función de esa reciprocidad de tenor constitucional, que hay que contextualizar y matizar la controversia ante nuestra consideración.
D. La Sec. 19 del Art. Ill antes citado incorpora a la Constitución el mecanismo de reconsideración. Durante el debate de la Convención Constituyente sobre esta disposición, se suscitó la siguiente discusión referente a este asunto. Citamos in extenso:
Sr. Presidente: ¿Alguna enmienda a la sección 13, [Sección 19 de la Constitución] ...?
Sr. Fernández Méndez: Para una pregunta, señor Presidente ... al Presidente de la Comisión. Sobre el artículo ....
Señor Fernández Méndez: A los fines de que conste en [actas], señor Presidente, ¿cuál es la intención de la comisión? Desearíamos también que se nos informe si este artículo 13, tal como está, en alguna forma priva a la Asamblea Legislativa de la facultad de pedir al ¡jefe], ejecutivo, durante los diez días que tiene él para firmar una ley o para devolverla a la Asamblea Legislativa ... si este artículo, tal como está redactado, le conserva el poder a la Asamblea Legislativa para, mediante resolución concurrente, pedir al [jefe] ejecutivo el proyecto que ya está en sus manos, para efectuar enmiendas la Asamblea Legislativa ....
Sr. Gutiérrez Franqui: Entendemos que en ninguna forma lo impide.
Sr. Fernández Méndez: ¿Esa es la intención de la comisión?
Sr. Gutiérrez Franqui: Y por el contrario lo permite.
Sr. Fernández Méndez: ¿Lo permite? La segunda pregunta, ¿podría pedirse al [jefe] ejecutivo la devolución de un proyecto por una sola de las cámaras o se requeriría que ambas cámaras, por resolución concurrente, lo hicieran para que tuvieran la facultad de hacerlo?
Sr. Gutiérrez Franqui: Compañero, yo entiendo que el procedimiento parlamentario tradicional, ni siquiera requiere la resolución concurrente, sino que es una mera petición de la cámara de origen al [jefe] ejecutivo, para que él devuelva un proyecto sobre el cual todavía no ha pasado, a los fines de reconsiderarlo e introducirle enmiendas.
Sr. Fernández Méndez: No.
Sr. Gutiérrez Franqui: Y se permite todavía que subsista ese procedimiento.
Sr. Fernández Méndez: No, no, no. La razón por la cual hemos *487 hecho la pregunta es porque ... discrepamos del compañero en cuanto a la interpretación que él hace de que ésta sea una mera cuestión parlamentaria. Esta es una cuestión sustantiva, tan sustantiva que se ha sustanciado ante los tribunales y unos tribunales han resuelto que, si la constitución no lo provee, puede no tener el poder; y en otras, que se requiere la acción conjunta de ambas cámaras y que una sola no podría hacerlo. Por eso queríamos, señor Presidente, para ver si había necesidad de formular alguna enmienda con la venia del señor Presidente, saber cuál era la intención del comité, pero veo que la contestación a la pregunta primera nos es satisfactoria, pues vemos que puede hacerlo por resolución conjunta. Ahora, la segunda que hacemos es si podría hacerlo una sola cámara. Sr. Gutiérrez Franqui: Compañero, no creo que debemos dejar en [actas] la interpretación de que es por resolución conjunta. Es por petición de la cámara de origen, con el consentimiento de la otra cámara.

Sr. Fernández Méndez: ¿Esa es la intención del comité?,

Sr. Gutiérrez Franqui: Y así puede seguirse haciendo. (Enfasis nuestro.) 3 Diario de Sesiones de la Convención Constituyente 1949 (1961).
Resulta evidente que nuestro ordenamiento constitucional permite que aún después de aprobada una medida legislativa, y estando ésta en las manos del Gobernador para su firma, las Cámaras puedan solicitar del Gobernador que les sea devuelta para su reconsideración. Es decir, el mecanismo de reconsideración es una prerrogativa constitucional que le asiste a la Asamblea Legislativa, que se puede ejercer aun después de que la medida haya salido del control de la Legislatura y se encuentre ante el Gobernador para su firma o veto.
Si ello es así para aquel proyecto que ya salió del control legislativo, soy del criterio que igual prerrogativa le asiste a los cuerpos entre sí, aun después de que una medida haya sido aprobada por ambos cuerpos y esté aguardando la firma para su remisión al Gobernador. Ahora bien, de la misma forma que para pedir la devolución y reconsideración de un proyecto aprobado que se encuentre en manos del Gobernador se requiere que ambos cuerpos hayan prestado su anuencia, así también, cuando se desee reconsiderar un proyecto ya aprobado por los cuerpos pero sin fir- *488 mar, la cámara que así lo desee deberá solicitar la anuencia del cuerpo hermano. Obtenido el consentimiento de dicho cuerpo, procede que se reconsidere la medida. Sólo de esta forma sería válida tal reconsideración.
Cabe destacar que luego de aprobada una medida por ambos cuerpos, ya la misma no representa un proyecto de ley de tal o cual cámara, sino la expresión de la Asamblea Legislativa. En vista de lo cual, para variar la expresión legislativa del cuerpo se requiere de la anuencia de las dos cámaras que lo componen. De esta forma se protege el voto ya emitido por los miembros del hermano cuerpo; de lo contrario, estaríamos frente a la anulación —por una de las cámaras— de los poderes de la otra y de sus miembros.
Esta es precisamente la posición que esboza don Néstor Rigual en su obra sobre el proceso legislativo en Puerto Rico. Rigual, quien fuera Secretario de la Cámara de Representantes desde 1953 hasta 1968, indica lo siguiente sobre la reconsideración. Citamos in extenso:
El trámite de reconsideración de una medida aprobada puede hacerse en cualquier momento. Si se hace en la sesión subsiguiente, aunque el proyecto sea del otro Cuerpo, no es necesario pedir consentimiento a la Cámara de origen. Tampoco es menester solicitar devolución, si el proyecto se halla en el Cuerpo que interesa la reconsideración. Si ésta se formula después que el proyecto ha sido remitido o devuelto al otro Cuerpo, se requiere entonces que, junto con la solicitud de consentimiento para reconsiderar, se pida la devolución de la medida.
La devolución para reconsiderar, se hace si el proyecto ha sido ya aprobado por una de las Cámaras, y se encuentra ante la consideración de la otra. Pero, si hubiere sido aprobado por ambas Cámaras, y todavía no firmado por el Presidente del Cuerpo de origen, porque éste deseare reconsiderarlo, entonces aquél solicita el consentimiento del otro Cuerpo para entrar en la reconsideración.
En caso de que la última Cámara que aprobó el proyecto acuerde reconsiderarlo después de haberlo devuelto a la Cámara de origen, entonces aquélla puede solicitar y obtener la devolución. En cambio, el caso es el opuesto cuando un proyecto de ley o resolución conjunta ha sido debidamente firmado en ambas Cámaras. Como la medida pasa a ser cosa *489 única de la Asamblea Legislativa, para que una Cámara pueda entrar en la reconsideración de aquélla, tiene que solicitar el consentimiento de la otra.
Pero hay más. Aun habiendo sido firmado y remitido al Gobernador, un proyecto de ley puede ser reconsiderado, previa solicitud de una Cámara a la otra, interesando su consentimiento para pedir al Gobernador la devolución del proyecto. Obtenido tal consentimiento, se envía una comunicación al Gobernador de Puerto Rico urgiendo dicha devolución. Si hasta el momento de recibir la solicitud el Gobernador no ha tomado acción respecto del proyecto, corresponde al Ejecutivo ordenar la devolución, como cuestión de cortesía al Poder Legislativo. (Énfasis nuestro.)
La reconsideración que hace uno de los cuerpos legislativos de un proyecto de ley ya aprobado no es un procedimiento extraño a nuestro esquema constitucional.(10) Sabiamente, nuestros Constituyentes previeron para ello. La pregunta a formularse en esta ocasión y frente al cuadro traído ante nuestra consideración es si se cumplió con el trámite correspondiente en este caso.
Apliquemos, entonces, la doctrina antes descrita a los hechos en controversia en este caso.
V
Iniciamos puntualizando que cada Cámara tiene amplia facultad para adoptar las reglas que estime propias para gobernar sus trámites internos; siempre y cuando, claro está, éstas sean compatibles con el ordenamiento constitucional. National Conference of State Legislatures, Masorís Manual of Legislative Procedure (Mason’s Manual), Minnesota, West Group, 2000, Sec. 10.3, pág. 19 *490 (“The power of each house of a state legislature to make its own rules is subordinate to the rules contained in the constitution”). Cada Cámara está facultada para enmendar o suspender en cualquier momento su propio reglamento o cualquier disposición de éste. Mason’s Manual, op. cit., Sec. 14, págs. 23-24.
Por lo tanto, nada impedía que la Cámara de Representantes, en la sesión del pasado 27 de junio, dejara sin efecto la Sec. 40.1 del citado Reglamento de la Cámara de Representantes, donde se establecía bajo qué circunstancias se podía solicitar la reconsideración de una medida ya aprobada. No le corresponde al Poder Judicial pasar juicio sobre esa determinación, pues es un asunto interno de cómo se conducen los procedimientos en dicho Cuerpo.
Ahora bien, lo que la Cámara no podía hacer era, sin tener la previa autorización del Senado de Puerto Rico, proceder con la reconsideración de la medida aprobada. Indicamos anteriormente que el proceso de reconsideración es de raigambre constitucional y que para que opere se requiere que la cámara que desee reconsiderar solicite el consentimiento de la otra cámara. Ausente tal anuencia, como en efecto nos indicó el Senado de Puerto Rico en su comparecencia, el procedimiento de reconsideración del Sustitutivo P. de la C. 2193 que siguió la Cámara de Representantes ofende la Constitución; como tal, se revela inoficioso.
Siendo ello así, y ya que no se ha sugerido que el proceso de aprobación del Sustitutivo P. de la C. 2193, seguido en la Cámara de Representantes el 21 de junio de 2006, incumplía con los parámetros constitucionales para la aprobación de un proyecto de ley, es un deber ministerial del Presidente de la Cámara de Representantes firmarlo y que el Secretario de dicho cuerpo lo remita al Gobernador dentro de un término razonable.(11)
*491 VI
Esencial para nuestra convivencia democrática es el respeto que una rama de gobierno le debe a la otra. Respeto que se traduce en el mutuo reconocimiento y resguardo de las facultades y prerrogativas de cada cual. Misión Ind. P.R. v. J.P., 146 D.P.R. 64 (1998); Banco Popular, Liquidador v. Corte, 63 D.P.R. 66 (1944).
Este Tribunal ha respetado siempre ese equilibrio constitucional. No hemos vacilado cuando las actuaciones de una rama irrumpen sobre las facultades intrínsecas de otra. Así, hemos sido enfáticos al rechazar la intromisión indebida de la Asamblea Legislativa con el ejercicio de la función judicial. Véanse: Misión Ind. v. J.P., ante; Vélez Ruiz v. E.L.A., 111 D.P.R. 752 (1981); Torres v. Castillo Alicea, 111 D.P.R. 792 (1981); Puerto Rico Tobacco Corporation v. Buscaglia, Tes., 62 D.P.R. 811 (1944). De la misma forma que hemos protegido celosamente nuestras prerrogativas constitucionales, hacemos lo propio respecto los otros poderes constitucionales.
De ahí que en Presidente de la Cámara v. Gobernador, 167 D.P.R. 149 (2006), opinión disidente de la Jueza Asociada Rodríguez Rodríguez, rechazáramos enfáticamente la actuación del Primer Ejecutivo cuando redujo unilateralmente el presupuesto de la Asamblea Legislativa. Consideramos en ese entonces que el proceder del Gobernador ofendía la Constitución y lesionaba el fino balance de poderes que ésta establece. Rehusamos reconocerle al señor Gobernador facultades extraordinarias no contempladas en la Constitución ni leyes que avalaran su actuación.
*492 En esta ocasión es uno de los cuerpos legislativos, la Cámara de Representantes, quien se ha excedido en sus facultades y ha actuado al margen de la Constitución al reconsiderar una medida aprobada de forma contraria a lo provisto en nuestra Ley Suprema. Ofende además a la Constitución que el Presidente de la Cámara de Representantes rehúse firmar la pieza aprobada para su remisión al Primer Ejecutivo. A la luz de los hechos en este caso, la firma del proyecto aprobado constituye un deber ministerial al cual no puede rehusarse. Rechazamos reconocerle a un cuerpo legislativo o a su Presidente facultades que no están contempladas en la Constitución en perjuicio de los poderes constitucionales del Gobernador, así como del Senado de Puerto Rico y sus Senadores.

 La Sec. 40.1 de ese reglamento dispone, en lo pertinente, de la manera siguiente:
“A solicitud de cualquier Representante, la Cámara podrá acordar la reconsideración de un asunto que haya sido resuelto, siempre que la solicitud se haga en la misma Sesión en que el asunto fue tratado o en el siguiente día de Sesión.” (Énfasis nuestro.) Reglamento de la Cámara de Representantes para la Decimocuarta Asamblea Legislativa de 13 de enero de 2005, pág. 98.

 No está en controversia que la parte peticionaria ha cumplido con los requisitos procesales del auto de mandamus, según detallados anteriormente.

 La Constitución del Estado Libre Asociado de Puerto Rico es resabio del pasado colonial y de las antiguas cartas orgánicas. Art. Ill, Sec. 17, Const. E.L.A., L.P.R.A., Tomo i. A pesar de que durante la Convención Constituyente se trató de flexibilizar el trámite de aprobación de leyes, se mantuvieron aun en el texto constitucional muchas de las disposiciones anteriores. Estas disposiciones fueron en su origen producto de la actitud de desconfianza en la gestión de los cuerpos legislativos que prevalecía en la sociedad del siglo XIX. Informe de la Comisión de la Rama Legislativa de la Asamblea Constituyente, 4 Diario de Sesiones de la Convención Constituyente 2584 (1952). Véase, además, R.F. Williams, State Constitutional Limits on Legislative Procedure: Legislative Compliance and Judicial Enforcement, 48 (Nmn. 3) U. Pitt. L. Rev. 797 (1987). Con gran agudeza, Trías Monge indica que la retención en el texto constitucional de alguna de las disposiciones provenientes de la Ley Orgánica fue producto de la “adoración irreflexiva de la antigua legislación orgánica”. J. Trías Monge, Cómo Fue: Memorias, Río Piedras, Ed. U.P.R., 2005, pág. 169.

 “P. de la C.” significa que se trata de un proyecto de ley presentado originalmente en la Cámara de Representantes. “P. del S.,” por el contrario, se refiere a un proyecto de ley presentado en el Senado de Puerto Rico.

 Al final de la última página de todo proyecto enrolado, se imprime una línea para la firma del Presidente del Senado y otra para la del Presidente de la Cámara de Representantes. N. Rigual, El poder legislativo de Puerto Rico, Río Piedras, Ed. U.P.R., 1961, pág. 104.

 Si el cuerpo de origen no concurre con las enmiendas, mediante una moción en dicho cuerpo, se ordena el envío del proyecto a un comité de conferencia. El Comité de Conferencia se compone de igual número de Senadores y Representantes. Éstos se ponen de acuerdo y preparan un informe con las enmiendas acordadas basadas en el texto en forma enrolada; pueden, si así lo estiman, demorar la acción de forma indefinida. Ahora bien, cuando se acuerdan las enmiendas, el Comité de Conferencia prepara un informe, el cual es enviado directamente al hemiciclo para votación. Si se aprueba por ambos cuerpos, la medida es enrolada y se le añade la palabra conferencia al número legislativo. Una vez hecho eso, los presidentes de los cuerpos la firman y se envía al Gobernador para el trámite final.

 Curiosamente, bajo la antigua Ley Orgánica de 1917, los presidentes de los cuerpos estaban obligados a firmar las medidas aprobadas.
“El Presidente de cada Cámara firmará, en presencia de la Cámara que presida, todos los proyectos de ley y resoluciones conjuntas aprobados por la Asamblea Legislativa, después que sus títulos hayan sido leídos públicamente, inmediatamente antes de firmar, y el hecho de firmar se hará constar en el acta.” Acta Jones, Documentos Históricos, See. 34, L.P.R.A., Tomo 1, ed. 1999, pág. 105.

 A modo de excepción, nos referimos a Scarborough v. Robinson, 81 N.C. 291 (1879), cuyas expresiones podrían interpretarse en el sentido de establecer una regla per se de discrecionalidad. Obsérvese, sin embargo, que se trataba allí de una Constitución estatal cuyo texto exigía la firma del proyecto, lo cual no ocurre en la Constitución del Estado Libre Asociado.

 Como se reconoce en la sección citada, el Tribunal Supremo de Nueva Jersey resolvió en Gilbert v. Gladden, 432 A.2d 1351, 1355 (N.J.1981), lo siguiente:
although the legislature is constitutionally required to present passed bills to the Governor, the timing of such presentment is discretionary, and a rule or practice delaying presentment is well within the legislative prerogative.”
Este caso, empero, es muy distinto al de autos, pues en aquél se había impugnado un fenómeno muy particular, viz.:
“... an unofficial custom of long duration, known as gubernatorial courtesy, whereby bills that have been passed in both houses of the Legislature are not presented to the Governor for signature or veto until the Governor requests them.” id., pág. 1353.

 La interpretación, en este sentido, que hace en su obra don Néstor Rigual sobre la reconsideración y a la que hicimos referencia extensamente, es de gran valor persuasivo, habida cuenta que es coetánea al momento inmediatamente posterior a la aprobación de la Constitución. Queda expuesta, además, por quien fuera precisamente en ese momento Secretario de la Cámara de Representantes. La interpretación contemporánea tiene siempre importancia en el ejercicio de la función judicial y es por ello que debemos considerarla. Hernández Agosto v. Romero Barceló, 112 D.P.R. 407, 424 (1982).

 Estamos conformes, por varias razones, con el término de veinticuatro horas que se ha concedido en esta ocasión para que el señor Presidente de la Cámara de *491 Representantes de Puerto Rico firme el proyecto aprobado y el Secretario de dicho cuerpo lo remita al Gobernador. Primero, adviértase que en este caso la legislación propuesta contemplaba que el impuesto sobre la venta que habrían de cobrar los municipios comenzaría a operar el 1 de julio de 2006. Segundo, ya concluyeron los trabajos de la Asamblea Legislativa al concluir la primera sesión ordinaria. Finalmente, y más importante, la reforma contributiva legislada se revela necesaria para atender serios problemas fiscales y crediticios del Estado Libre Asociado de Puerto Rico, como han reconocido todas las partes.